In re WORKERS COMPENSATION REFUND.

Nos. 4–93–CV–515, 4–93–CV–516, 4–93–CV–555 and 4–93–CV–577.

United States District Court,
D. Minnesota,
Fourth Division.

Feb. 11, 1994.

James Thomas Martin, Dan Thomas Ryerson, Gislason Martin & Varpness, Edina, MN, for plaintiff Western Nat. Mut. Ins. Co., a MN ins. corp.

Carolyn Page Ham, Jocelyn Furtwangler Olson, Asst. Attys. Gen., St. Paul, MN, for defendants John B. Lennes, Jr., individually and as Com'r, MN Dept. of Labor and Industry, James E. Ulland, individually and as Com'r, MN Dept. of Commerce.

John F. Stone, Oppenheimer Wolff & Donnelly, Minneapolis, MN, for defendant Workers' Compensation Reinsurance Ass'n, a non-profit ass'n.

Karl Craig Wildfang, Wood Robertson Foster, Jr., Anne Kathryn Weinhardt, Siegel Brill Greupner & Duffy, Minneapolis, MN, for intervenors-defendants Care Providers of MN, Inc., a MN corp., Health Dimensions, Inc., a MN corp., Medcare Associates, a MN corp., North Cities Health Care, Inc., a MN corp., Walker Methodist, Inc., a MN non-profit corp.

Elizabeth L. Taylor, John Frederick Beukema, John Dwyer French, Faegre & Benson, Minneapolis, MN, for plaintiffs St. Paul Fire & Marine Ins. Co., and its subsidiaries St. Paul Mercury Ins. Co., and St. Paul

Guardian Ins. Co., Tri-State Ins. Co. of MN, Aetna Cas. and Sur. Co., and its subsidiaries The Standard Fire Ins. Co., The Auto. Ins. Co. of Hartford, CT, Farmington Cas. Co., and Aetna Cas. & Sur. Co. of IL, Fireman's Fund Ins. Co., and its subsidiaries American Auto. Ins. Co., Associated Indem. Corp., Fireman's Fund Ins. Co. of WI, Nat. Sur. Corp.; and the American Ins. Co., Great American Ins. Co., and its subsidiaries American Alliance Ins. Co., Agr. Ins. Co., and American Nat. Fire Ins. Co., Ins. Co. of North America, and its subsidiaries Indem. Ins. Co. of North America, CIGNA Ins. Co., Pacific Employers Ins. Co., CIGNA Property & Cas. Ins. Co., CIGNA Fire Underwriters Ins. Co., Bankers Standard Ins. Co., and Century Indem. Co., Home Ins. Co., and its subsidiaries Home Indem. Co., City Ins. Co., and Home Ins. Co. of IN, American Mfrs. Mut. Ins. Co., American Motorists Ins. Co., American Protection Ins. Co., Lumbermens Mut. Cas. Co., collectively known as the Kemper Nat. Ins. Companies, Royal Indem. Comp, and its affiliates American & Foreign Ins. Co., Globe Indem. Co., Newark Ins. Co., Royal Ins. Co. of America, Safeguard Ins. Co., and Milbank Ins. Co., U.S. Fidelity & Guar. Co., and its subsidiaries Fidelity Guar. Ins. Co. and Fidelity and Guar. Ins. Underwriters, Inc., Zurich Ins. Co. U.S. Branch, and its affiliate American Guar. and Liability Ins. Co.

James Robert Safley, Annamarie Audrey Daley, Randall M. Tietjen, Robins Kaplan Miller & Ciresi, Minneapolis, MN, for plaintiffs MN Mut. Fire and Cas., Employers Ins. of Wausau, a Mut. Co., Farmland Mut. Ins. Co., Federated Mut. Ins. Co., Liberty Mut. Ins. Co., Liberty Ins. Corp., Liberty Mut. Fire Ins. Co., Lumbermen's Underwriting Alliance, Nationwide Mut. Ins. Co., Nationwide Mut. Fire Ins. Co., Wausau Underwriters Ins. Co.

Daniel Patrick O'Keefe, Sonja Gail Lemmer, Dorsey & Whitney, Minneapolis, MN, for plaintiffs Continental Cas. Co., Continental Ins. Co., Transportation Ins. Co., National Fire Ins. Co., American Cas. Co. of Reading, PA, Valley Forge Ins. Co.

## ORDER

ROSENBAUM, District Judge.

One day, the Board of Directors of the Workers' Compensation Reinsurance Association ("WCRA") found over $400 million. It is not surprising that a number of people, and a number of entities, became interested in this serendipitous occurrence. The upshot of this interest is these consolidated actions, in which the Court is asked to determine the constitutionality of the Workers' Compensation Reinsurance Act of 1993, Minn.Sess. Laws, Chapter 361 (May 24, 1993) ("Chapter 361"). The plaintiffs have moved for summary judgment. The defendants agree that the matter is ripe for summary judgment, but ask that the Court enter judgment in their favor. The Court heard oral argument on September 10, 1993.

## I. Background

### A. The Parties

The plaintiffs in each of these actions are insurance companies which provide workers' compensation insurance to employers in Minnesota. Defendant, John B. Lennes, Jr. ("Lennes"), a Minnesota resident, is sued individually, and in his official capacity as Commissioner of the Minnesota Department of Labor and Industry. Defendant James E. Ulland, a resident of Minnesota, is sued individually, and in his official capacity as Commissioner of the Department of Commerce.[1] The Workers' Compensation Reinsurance Association ("WCRA"), which is also named as a defendant, is a Minnesota non-profit association.[2] The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

### B. WCRA

WCRA is a child of the Minnesota legislature, having been created in 1979. See generally, Minn.Stat. §§ 79.34–79.40 (1992). Under legislation enacted in 1979, all workers' compensation insurers and self-insured employers are required to belong to WCRA. WCRA members must purchase workers' compensation reinsurance from WCRA. This purchase is a condition of their authority to issue workers' compensation insurance, or to self-insure for workers' compensation claims, in this State. Minn.Stat. § 79.34, subd. 1 (1992). WCRA, itself, is governed by a 13–member board of directors. These directors include representatives of employees, employers, insurers, self-insurers, and the public. Among the directors are Minnesota's Commissioner of Finance, and the Executive Director of the State Board of Investment. Minn.Stat. §§ 79.34, 79.37 (1992).

Pursuant to its enabling statute, WCRA has promulgated a Plan of Operation ("Plan"), which serves as WCRA's articles of incorporation and its bylaws. See Minn.Stat. §§ 79.34, subd. 1 and 79.38, subd. 2 (1992). The Plan is binding on each WCRA member. Id. WCRA also adopted Operating Rules ("Rules"), pursuant to Minn.Stat. § 79.36(e) (1992). The relationship between WCRA and the members is formalized in a written Agreement of Reinsurance ("Agreement") issued to each member by WCRA.

By law, the WCRA Board of Directors calculates and assesses against its members a reinsurance premium. This sum is calculated to cover expected reinsurance claims. Minn.Stat. § 79.35(d). The assessed sum constitutes the reinsurance pool, from which extremely large workers' compensation sums are to be paid.

■ The problem in this case, and the issue of immediate concern, is the excess in the reinsurance fund.[3] Because of changing risk assessments and actuarial assumptions, and based on the most recent calculations, there is an excess of approximately $402 million in the reinsurance pool. This sum represents the aggregate excess of reinsurance premiums accumulated between 1979

---

1. James E. Ulland, the current Commissioner of the Department of Commerce, is substituted as defendant for Bert J. McKasy, pursuant to Rule 25(d), Federal Rules of Civil Procedure.

2. On September 10, 1993, in a ruling from the bench, the Court denied a motion for intervention on behalf of a putative class of Minnesota employers.

3. Chapter 361 refers to this sum as "excess surplus."

and 1992. It is the refund and distribution of this sum which underlies this lawsuit.

Prior to the enactment of Chapter 361, WCRA's Plan, Rules, and Agreement, provided that WCRA members would jointly contribute to the fund for any shortages, or jointly receive any excess amounts accumulated, in the reinsurance pool. Any contribution or refund was subject to the approval of the Commissioner of Labor and Industry. Plan of Operation, Part VI.D.; Operating Rules, Part 1.7.D.; Agreement of Reinsurance, Part VI.F.

In September, 1992, while operating under the WCRA Plan, Rules, and Agreement, WCRA's Board of Directors determined that the reinsurance fund exceeded required reserves by $100 million for the 1979 through 1986 period. Having identified this surplus, and pursuant to statute, its Agreement, and Rules, the Board adopted a resolution to refund this $100 million excess sum to current members of WCRA. The excess premiums were to be distributed, based on the proportion of reinsurance premiums that each WCRA member had paid during the 1979 through 1986 period. On October 19, 1992, Lennes issued an order approving the distribution, and the $100 million was distributed to WCRA members.

In February, 1993, WCRA's Board of Directors declared further excess premiums in the amount of approximately $302 million for the 1979 through 1992 period. These excess reinsurance premiums were to be distributed to current WCRA members, based on each members' proportionate share of reinsurance premiums paid from 1979 through 1992. Pending passage of the legislation, Lennes declined to sign the authorization to distribute the $302 million. This $302 million sum was never distributed to insurer members of WCRA due to the passage of Chapter 361.[4]

C. *Chapter 361*

In 1993, the Minnesota State Legislature enacted Chapter 361 which, among other things, redirected the past and pending WCRA distribution. On May 24, 1993, the Governor signed Chapter 361 into law.[5] In the relevant portion of the statute, Chapter 361 directs that the entire $402 million in excess premiums be distributed to 1992 workers' compensation insurance policyholders and self-insurers, rather than to the WCRA insurance companies. The statute directs a pro rata distribution based on each self-insured employer's or employer-policyholder's 1992 workers' compensation premiums. Specifically, Chapter 361, § 2, provides that insurer members of WCRA must refund the previously distributed $100 million excess to their 1992 policyholders. Section 4 of the Act provides that the $302 million in undistributed excess premiums, less the amount payable to self-insured employer members, shall be paid directly to employers in shares proportionate to the premiums paid by each insured employer in 1992.[6]

After purporting to redistribute the 1979 through 1992 fund excess, the Act redefines WCRA's obligations with respect to future excesses or fund deficiencies. In this regard, Section 4 of the Act provides for the distribution of future excess premiums to self-insured and employer-policyholders. Chapter 361 also shifts the risk of future deficiencies to employer-policyholders. Chapter 361, § 5, subd. 2a. Finally, the statute provides that WCRA must reimburse all litigation costs, including attorney's fees, which the State incurs as a result of any litigation involving the enforcement or validity of the Act. Chapter 361, § 10.

Plaintiffs challenge the constitutionality of Chapter 361 under the Contract Clause, art I., § 10, and the First, Fifth, and Fourteenth Amendments to the United States Constitu-

---

**4.** Defendants have stipulated that, but for the passage of Chapter 361, the $302 million in excess premiums would have been distributed to WCRA members. Defendants have agreed that, should the Court declare Chapter 361 unconstitutional, such a distribution shall be made. *See* Stipulation, June 4, 1993, at 2–4.

**5.** The Act became effective the following day, and applies retroactively to August 1, 1992. Chapter 361, § 12.

**6.** Under the Act, self-insured members of WCRA remain entitled to a share of the excess premiums. Self-insured WCRA members have received their share of the $302 million pursuant to the June 4, 1993, Stipulation.

tion. Plaintiffs argue that Chapter 361 impairs their contracts with WCRA and their policyholders, and that Chapter 361 is an unconstitutional taking without just compensation. Plaintiffs also argue that Chapter 361, § 10, the litigation cost-shifting provision, impermissibly burdens plaintiffs' First Amendment rights.

## II. *Analysis*

### A. *The Contract Clause*

■ The Contract Clause of the Constitution of the United States provides that "[n]o state shall ... pass any ... Law impairing the Obligation of Contracts ..." U.S. Const. art. I, § 10. Whether a state enactment unconstitutionally impairs a contract is determined by applying a three prong test, as delineated in *Energy Reserves Group, Inc. v. Kansas Power and Light Co.*, 459 U.S. 400, 411–13, 103 S.Ct. 697, 704–05, 74 L.Ed.2d 569 (1983) and *United States Trust Co. v. New Jersey*, 431 U.S. 1, 17–22, 97 S.Ct. 1505, 1515–18, 52 L.Ed.2d 92 (1977). The threshold question under the Contract Clause is whether the state law operates as a substantial impairment of a contractual relationship. *Energy Reserves Group*, 459 U.S. at 411, 103 S.Ct. at 704. If a substantial impairment is found, then the State must demonstrate a "significant and legitimate public purpose" for the statute, "such as the remedying of a broad and general social or economic problem." *Id.* at 411–12, 103 S.Ct. at 704–05. Finally, if the State identifies such a significant and legitimate public purpose, a reviewing Court must examine whether "the adjustment of the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." *Id.* at 412, 103 S.Ct. at 705 (quoting *United States Trust Co.*, 431 U.S. at 22, 97 S.Ct. at 1518).

### 1. *Impairment*

■ In determining whether Chapter 361 substantially impairs plaintiffs' contractual relationships, the Court must consider the extent to which the parties' reasonable contractual expectations are disrupted. *See Energy Reserves Group*, 459 U.S. at 411, 103 S.Ct. at 704; *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245–47, 98 S.Ct. 2716, 2723–24, 57 L.Ed.2d 727 (1978); *United States Trust Co.*, 431 U.S. at 31, 97 S.Ct. at 1522. A related consideration is the level of government regulation of the industry in which plaintiffs are engaged. *Energy Reserves Group* at 411, 413–14, 103 S.Ct. at 704, 705–06; *Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 38, 60 S.Ct. 792, 794, 84 L.Ed. 1061 (1940); *Farmers Union Agency, Inc. v. Butenhoff*, 808 F.Supp. 677, 683 (D.Minn.1992). Heightened levels of contractual impairment increase the level of scrutiny to which the legislation is subject. *Energy Reserves Group*, 459 U.S. at 411, 103 S.Ct. at 704.

Here, the plaintiffs maintain that Chapter 361 has substantially impaired their contracts with WCRA. They argue that this contract is comprised of WCRA's Plan, Rules, and Agreement. In the plaintiffs' view, these documents define a contractual right to receive a distribution of any excess WCRA premiums. Plaintiffs argue that this right has been expressly and wholly abrogated by Chapter 361. Plaintiffs next argue that Chapter 361 impairs their contractual relationship with their policyholders, by imposing on insurers a liability which goes beyond their insurance policy contracts. Briefly, it is their position that they contracted to provide coverage for workers' compensation claims. They assert that they have provided this coverage, and have no contractual obligation to rebate reinsurance premiums to their insureds.

The defendants counter that WCRA is a state-created monopoly, and any agreement between WCRA and its members is automatically amended by legislative changes to Minn.Stat. §§ 79.34 to 79.40 (1992).[7] There-

---

7. *See* Plan of Operation, Part IX.E ("[T]he Plan and the Reinsurance Agreement shall be deemed to be automatically amended to conform to any amendment to the [Workers Compensation Reinsurance] Act, or to adoption of or amendment to other Minnesota law ..."); Agreement of Reinsurance, Part I.D ("This agreement shall be deemed to be automatically amended to conform to any amendment to the enabling act, other provisions

fore, according to defendants, plaintiffs can have no reasonable expectation of an immutable contract, when the language of the alleged contract explicitly provides for statutory amendment. In this regard, defendants cite *Energy Reserves Group* and *Bowen v. Public Agencies Opposed to Social Sec. Entrapment*, 477 U.S. 41, 55, 106 S.Ct. 2390, 2398, 91 L.Ed.2d 35 (1986). Defendants' view, in short, is that the very contract upon which plaintiffs rely provides for statutory change.

Additionally, defendants argue that any contractual right to the second distribution of $302 million never vested, because Chapter 361 was enacted prior to the Commissioner's approval of the second distribution. *See* Minn.Stat. § 79.35(d) (1992); Plan of Operation, Part VI.D.1 (distribution of excess premiums is conditioned on the approval of the Commissioner of Labor and Industry). Therefore, according to the defendants, regardless of any decision concerning the first distribution of $100 million, the plaintiffs never had a fully vested right in the $302 million sum.

Finally, defendants argue that if even Chapter 361 does impair plaintiffs' contractual rights, the impairment is insubstantial. Defendants argue that plaintiffs' expectations must be viewed through the prism of heavy regulation governing the workers' compensation insurance industry. Defendants urge the Court to find that plaintiffs must expect change in a legislatively-regulated industry. In defendants' view, this is further emphasized when one considers that, until 1992, no declaration of surplus had ever been made in WCRA's 13 year history. Defendants finally state that if plaintiffs did not wish to be subject to changing statutory regimes, they could have chosen to write workers' compensation insurance in states other than Minnesota.

The Court rejects the defendants' arguments. The Court finds that the retroactive application of Chapter 361 substantially impairs the terms of plaintiffs' contracts with WCRA. These terms, defined by the Agreement, Plan, and Rules, provide plaintiffs with a reasonable expectation that if they paid

of Minnesota law, the Plan [of Operation], or the

excess premiums to WCRA, those excess premiums would be returned them. By enacting Chapter 361, the Minnesota legislature has annihilated these settled contractual expectations.

The Court recognizes, as it must, that workers' compensation insurance is comprehensively regulated. Further, the Court cannot deny that a state legislature can compel one or another kind of coverage, or compel participation in a risk pool or a high exposure program. But it rings hollow for the State to blithely announce that it can divest a group of insurers of almost half a billion dollars, by simply saying the insurers knew it was risky to do business in Minnesota. There are limits, even in regulated industries, and those limits are surpassed here.

The Court rejects defendants' suggestion that plaintiffs' right to the $302 million distribution never vested. As set forth above, plaintiffs reasonably expected that if any excess premiums were declared, that excess would be remitted to them. In fact, defendants have stipulated that, but for Chapter 361, the excess would have been distributed to plaintiffs. Defendants' overly-technical argument, undermined by their own stipulation, is insufficient to overcome the conclusion that plaintiffs' contractual rights have been impaired.

### 2. *Public Purpose/Fairness and Reasonableness*

■ Having found that Chapter 361 substantially impairs plaintiffs' contracts, *Energy Reserves Group* directs a court to consider the state's justification for the impairment. State regulation of existing contractual relationships must serve a legitimate and significant public purpose. *Energy Reserves Group*, 459 U.S. at 412–13, 103 S.Ct. at 705–06; *U.S. Trust Co.*, 431 U.S. at 22, 97 S.Ct. at 1518. "The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Energy Reserves Group*, 459 U.S. at 412, 103 S.Ct. at 705. To withstand constitutional scrutiny, the law must "protect a broad societal inter-

Operating Rules ...").

est, rather than a narrow class." *Allied Structural Steel*, 438 U.S. at 249, 98 S.Ct. at 2724. If the legislation is justified by a legitimate public purpose, the next inquiry is whether the legislation is reasonable and appropriate to that public purpose. Unless the state, itself, is a contracting party, courts properly defer to legislative judgment as to the reasonableness of a particular measure. *Energy Reserves Group*, 459 U.S. at 412–13, 103 S.Ct. at 705–06.

The legislature's professed purpose in shifting the distribution of excess reserves from insurers to employers, is "to benefit employers by lowering their costs for mandated workers' compensation insurance ..." Chapter 361, § 1. Defendants argue that Chapter 361 serves the significant and legitimate purpose of reducing Minnesota employers' cost of doing business and eliminating a windfall for workers' compensation insurers. Defendants cite the historically high cost of workers' compensation insurance in Minnesota, and argue that the purpose of Chapter 361 is consistent with the stated purpose of WCRA—to reduce the cost of workers' compensation insurance for employers. Defendants reason that employers were the ones who ultimately paid the WCRA reinsurance premiums through their workers' compensation premiums, and it is to these insureds that the excess should be given. Plaintiffs reply that the Minnesota legislature did not enact Chapter 361 to address a broad, generalized economic or social problem. Instead, plaintiffs argue Chapter 361 merely redistributes money from one private group to another.

The stated purpose of Chapter 361—minimizing employers' workers' compensation costs—can be a legitimate public purpose; so, too, can eliminating windfall profits. *Energy Reserves Group*, 459 U.S. at 413, 103 S.Ct. at 706. Even recognizing, however, that the professed purpose of Chapter 361 may be legitimate, the Court finds that the

statute, as retroactively applied, is neither reasonable nor appropriate to these goals.[8]

A moment's reflection reveals that the excess premiums are funds accrued over seven years from 1979 to 1986 (for the $100 million distribution) or over 13 years from 1979 to 1992 (for the $302 million distribution). But the legislature gives the entire sum to 1992 employers, based on 1992 premiums. It is clear that those employers who paid workers' compensation premiums from 1979 through 1991, who under defendants' theory are the ultimate payors of the excess premiums, will not necessarily benefit from Chapter 361. Moreover, while giving money to a purchaser certainly lowers that purchaser's cost, this is scarcely a means of reducing workers' compensation premiums. Nor does Chapter 361 eliminate a windfall. It simply awards the windfall to different, legislatively-preferred recipients. To give a sum accrued over 13 years to an employer who may have paid its first workers' compensation premium in 1992, with no consideration to whomever created the surplus, just moves any windfall from one place to another. It is neither reasonable nor appropriate to create a windfall for one private group at the expense of another. *Allied Structural Steel v. Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). Therefore, Chapter 361, as applied retroactively, fails to withstand scrutiny under the Contract Clause analysis.

Finally, the defendants argue that Chapter 361 can be saved by the fact that it shifts any risk of future deficiencies away from insurers and places it directly upon self-insured employers and employer-policyholders. Section 5 of the Act provides that, if after a distribution of excess premiums to employers, the Board discovers that inadequate funds are available for claims arising out of the period for which the distribution was calculated, employers will be assessed the shortfall. *See* Chapter 361, § 5.[9]

---

8. The parties' briefs do not directly address the constitutionality of the prospective application of Chapter 361. Accordingly, the Court makes no specific findings as to the prospective aspects of Chapter 361.

9. Section 5 of Chapter 361 provides:

[If] the Board determines that a distribution of excess surplus resulted in inadequate funds being available to pay claims that arose during the period upon which that distribution was calculated, the Board shall determine the amount of the deficiency. The deficiency shall be made up by imposing an assessment rate

The first glaring flaw in the defendants' argument is that this turns the current policyholders—who are the insureds—into insurers. This is not the way insurance works. It is insurance companies, not the insureds, who are structured and financially girded to protect against accrued risk.

A second defect is that this deficiency provision places the risk of past years' deficiencies on present policyholders. This is the contra-inverse of giving all of the accrued surplus from 1979 through 1992 to 1992 policyholders. Under Chapter 361, if the Board calculates a shortage in a given year, it will be paid by that year's policyholders. This "solution" flies in the face of reality. The Court cannot be blind to the fact that there is a necessary lead time in recognizing the cost and the ultimate resolution of large workers' compensation claims. As an example, large claims which are settled or resolved in 1994 will necessarily result from settlements of pre–1994 workplace accidents. It is charming, but facile, for the legislature to say that the risk of past-occurring costs should fall on present-paying employers. It is as wrong to ask a 1994 insurance purchaser to pay for accidents or actuarial miscalculations which accrued before they purchased insurance, as it is to grant them a surplus to which they have not contributed. This legislative fix could well be a financial catastrophe, rather than a rate-reducing mechanism for employers.

In sum, the plaintiffs reasonably expected, under the terms of the WCRA Plan, Rules, and Agreement, that they were entitled to the excess reinsurance premiums which they paid from 1979 until the date of passage of Chapter 361. Chapter 361 disrupts these settled expectations. Furthermore, the Court does not find that Chapter 361, to the extent that it is retroactively applied, is reasonable and appropriate to the goal of reducing the cost of workers' compensation insurance. Accordingly, the Court finds that Chapter 361, as it applies retroactively, is unconstitutional.[10]

against self-insured members and policyholders of insurer members.

### III. *Cost–Shifting Provision*

■ Section 10 of Chapter 361 provides that WCRA must reimburse the state for all attorneys' fees and costs resulting from litigation involving the enforcement or validly of the Act. Plaintiffs argue that this section violates their right, under the First and Fourteenth Amendment, to petition the courts for the redress of grievances. Moreover, plaintiffs contend that Section 10 violates the Supremacy Clause of Article VI, § 2 of the United States Constitution, because it is preempted by 42 U.S.C. § 1983. Defendants respond that the issue of attorneys' fees is not ripe for judicial review, since the State has not yet made a demand for fees and costs. Alternatively, defendants argue that the provision is plainly constitutional.

As an initial matter, the Court finds that this issue is ripe for review. Regardless of whether or not the Court were to uphold the constitutionality of any other section of Chapter 361, it is to be expected that the State will comply with the legislature's mandate, and attempt to effectuate Section 10's directive to recoup its expenses. Section 10 of Chapter 361 provides that WCRA "*shall* reimburse the state" for costs and fees. Chapter 361, § 10 (emphasis added). Resolving this question at this juncture furthers the interests of efficiency and judicial economy. The Court turns, therefore, to the plaintiffs' First Amendment challenge.

The First Amendment right to petition the courts for the redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights." *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972). The right of access to the courts is one aspect of the right of petition. *Harrison v. Springdale Water & Sewer Comm'n,* 780 F.2d 1422, 1427 (8th Cir. 1986). As enunciated in *Harrison,* this right of court access:

... cannot be impaired, either directly ... or indirectly, by threatening or harassing

10. As the court has found Chapter 361 unconstitutional under the Contract Clause, it declines to consider the plaintiffs' Fifth and Fourteenth Amendment claims.

[an individual] in retaliation for filing lawsuits ... [S]tate officials may not take retaliatory action against an individual designed either to punish him for having exercised his constitutional right to seek judicial relief or to intimidate or chill his exercise of that right in the future.

*Id.* at 1427–28 (citing *Sanders v. St. Louis County,* 724 F.2d 665 (8th Cir.1983)). In plaintiffs' view, Section 10 was enacted to deter litigation, or to punish any litigant for bringing suit, regardless of the outcome of the action. The Court is in accord.

The Court finds that Section 10 impermissibly burdens plaintiffs' First Amendment right of access to the courts. It is obvious to the Court that Section 10 was purposefully inserted because the legislature knew Chapter 361 would incite a challenge. This section can only be seen as an unconstitutional effort to forestall and encumber this predictable lawsuit. The legislature may not financially hobble an opponent to protect its enactment.

Defendants' contention that the commencement of this litigation is proof that the provision lacked any chilling effect is a sophistry. As made clear in *Harrison,* "[i]t is not necessary that the [individual] succumb entirely or even partially to the threat as long as the threat or retaliatory act was intended to limit the [individual's] right of access." *Id.* at 1427–28. Section 10 was intended to chill the plaintiffs. The fact that it failed will not be considered in its defense.

IV. *Conclusion*

For the reasons set forth above, and based on all the files, records, and proceedings herein, IT IS ORDERED that:

1. Plaintiffs' motion for summary judgment is granted.

2. Defendants' motion for summary judgment is denied.

3. The defendants are enjoined from enforcing Chapter 361 to recover or redistribute the September, 1992, WCRA excess surplus distribution, or to impede the February, 1993, WCRA excess surplus distribution.

4. The defendants are enjoined from enforcing Chapter 361, § 10.

5. The motion for intervention is denied, *nunc pro tunc* September 10, 1993.

LET JUDGMENT BE ENTERED ACCORDINGLY.