46 F.3d 813
 63 USLW 2490
 In re WORKERS' COMPENSATION REFUND.
WESTERN NATIONAL MUTUAL INSURANCE COMPANY, a Minnesota
insurance company, Plaintiff/Appellee
v.
John B. LENNES, Jr., individually and as Commissioner,
Minnesota Department of Labor and Industry; James E.
Ulland, individually and as Commissioner, Minnesota
Department of Commerce; Defendants/Appellants
Workers' Compensation Reinsurance Association, a non-profit
association; Defendant
Care Providers of Minnesota, Inc., a Minnesota corporation;
Health Dimensions, Inc., a Minnesota corporation; Medcare
Associates, a Minnesota corporation; North Cities Health
Care, Inc., a Minnesota corporation; Walker Methodist,
Inc., a Minnesota non-profit corporation, Intervenors/Defendants.
St. Paul Fire and Marine Insurance, and its subsidiaries St. Paul Mercury Insurance Company, and St. Paul Guardian Insurance Company; Tri-State Insurance Company of Minnesota; Aetna Casualty and Surety Company, and its subsidiaries The Standard Fire Insurance Company, The Automobile Insurance Company of Hartford, CT, Farmington Casualty Company, and Aetna Casualty & Surety Company of Illinois; Fireman's Fund Insurance Company, and its subsidiaries American Automobile Insurance Company, Associated Indemnity Corporation, Fireman's Fund Insurance Company of Wisconsin, National Surety Corp., and The American Insurance Company; Great American Insurance Company, and its subsidiaries American Alliance Insurance Company, Agricultural Insurance Company, and American National Fire Insurance Company; Insurance Company of North America, and its subsidiaries Indemnity Insurance Co. of North America, CIGNA Insurance Company, Pacific Employers Insurance Company, CIGNA Property & Casualty Insurance Company, CIGNA Fire Underwriters Insurance Company, Bankers Standard Insurance Company, and Century Indemnity Company; Home Insurance Company, and its subsidiaries Home Indemnity Company, City Insurance Company, and Home Insurance Company of Indiana; American Manufacturers Mutual Insurance Company; American Motorists Insurance Company; American Protection Insurance Company; Lumbermens Mutual Casualty Company, collectively known as the Kemper National Insurance Companies; Royal Indemnity Company, and its affiliates American & Foreign Insurance Company, Globe Indemnity Company, Newark Insurance Company, Royal Insurance Company of America, Safeguard Insurance Company, and Millbank Insurance Company; United States Fidelity & Guaranty Company, and its subsidiaries Fidelity Guaranty Insurance Company and Fidelity and Guaranty Insurance Underwriters, Inc.; Zurich Insurance Company, U.S. Branch, and its affiliate American Guarantee and Liability Insurance Company, Plaintiffs/Appellees
v.
James E. ULLAND, in his official capacity as Commissioner of
the Department of Commerce of the State of Minnesota; John
B. Lennes, Jr., in his official capacity as Commissioner of
the Department of Labor and Industry of the State of
Minnesota; Defendants/Appellants
Workers' Compensation Reinsurance Association, a Minnesota
non-profit association; Defendant
Care Providers of Minnesota, Inc., a Minnesota non-profit
corporation, Health Dimensions, Inc., a Minnesota
corporation; Medcare Associates, a Minnesota corporation;
North Cities Health Care, Inc., a Minnesota corporation;
Walker Methodist, Inc., a Minnesota non-profit corporation,
Intervenors/Defendants.
MINNESOTA MUTUAL FIRE AND CASUALTY; Employers Insurance of
Wausau, a Mutual Company; Farmland Mutual Insurance
Company; Federated Mutual Insurance Company; Liberty
Mutual Insurance Company; Liberty Insurance Corporation;
Liberty Mutual Fire Insurance Company; Lumbermen's
Underwriting Alliance; Nationwide Mutual Insurance Company;
Nationwide Mutual Fire Insurance Company; Wausau
Underwriters Insurance Company, Plaintiffs/Appellees
v.
James E. ULLAND, individually and in his official capacity
as Commissioner of Minnesota Department of Commerce; John
B. Lennes, Jr., individually and in his official capacity as
Commissioner of the Department of Labor and Industry;
Defendants/Appellants
Workers' Compensation Reinsurance Association, a Minnesota
non-profit association; Defendant
Care Providers of Minnesota, Inc., a Minnesota non-profit
corporation; Health Dimensions, Inc., a Minnesota
corporation; Medcare Associates, a Minnesota corporation;
North Cities Health Care, Inc., a Minnesota corporation;
Walker Methodist, Inc., a Minnesota non-profit corporation,
Intervenors/Defendants.
CONTINENTAL CASUALTY COMPANY; Continental Insurance
Company; Transportation Insurance Company; National Fire
Insurance Company; American Casualty Company of Reading,
PA; Valley Forge Insurance Company, Plaintiffs/Appellees
v.
James E. ULLAND, in his official capacity as Commissioner of
the Department of Commerce of the State of Minnesota; John
B. Lennes, Jr., in his official capacity as Commissioner of
the Department of Labor and Industry of the State of
Minnesota; Defendants/Appellants
Workers' Compensation Reinsurance Association, a Minnesota
non-profit association; Defendant
Care Providers of Minnesota, Inc., a Minnesota non-profit
corporation; Health Dimensions, Inc., a Minnesota
corporation, Medcare Associates, a Minnesota corporation;
North Cities Health Care, Inc., a Minnesota corporation;
Walker Methodist, Inc., a Minnesota non-profit corporation,
Intervenors/Defendants.
 No. 94-1744.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 14, 1994.
Decided Jan. 31, 1995.
 
 Carolyn Page Ham, St. Paul, MN, argued, for appellant.
 James R. Safley, and John Dwyer French, Minneapolis, MN, argued, for appellees.
 Before BEAM, Circuit Judge, FRIEDMAN,* Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.
 BEAM, Circuit Judge.
 
 
 1
 In this consolidated action, various insurance companies challenge the constitutionality of a Minnesota statute which retroactively redistributes excess premiums. The insurance companies also challenge the statute's cost-shifting provision. The district court granted the insurance companies' motion for summary judgment, finding that the retroactive application of the statute violated the Contract Clause and that the cost-shifting provision violated the First Amendment. After reviewing the grant of summary judgment de novo, we affirm the district court.
 
 I. BACKGROUND
 
 2
 Prompted by the rising costs of workers' compensation insurance in Minnesota, the Minnesota legislature created the Workers' Compensation Reinsurance Association ("WCRA") in 1979. This non-profit association reinsures all providers of workers' compensation insurance in Minnesota. All such providers, both insurance companies and self-insured employers, must be members of and pay premiums to WCRA. The premiums are calculated to cover expected reinsurance claims.
 
 
 3
 Rights and responsibilities of the insurance companies and WCRA are allocated through the WCRA Operating Plan, WCRA's Operating Rules and the Reinsurance Agreements between WCRA and its members. These documents provide that WCRA will reimburse the insurance companies for all payments made on a given claim once the claim exceeds a certain monetary amount. The documents also contain an automatic amendment provision ensuring that all changes in Minnesota law are immediately incorporated into the agreements.
 
 
 4
 WCRA used conservative actuarial assumptions to be certain that future payments could be met. After several years, WCRA determined that these assumptions were overly cautious. This resulted in a large surplus in the reinsurance pool which accrued from 1979 to 1992. At that time, the documents stated that WCRA would collect from or distribute to the insurance companies extra or excess premiums in the event of shortages or unneeded accumulations in the reinsurance pool. In accordance with the written agreements, WCRA distributed a $100 million surplus to its members. Further accounting revealed that WCRA had an additional surplus of $302 million. WCRA made plans to distribute that money to its members as well.
 
 
 5
 Before the second distribution was finalized, the Minnesota legislature quickly enacted Chapter 361. Although Chapter 361 was enacted on May 24, 1993, it purported to apply retroactively both to the $100 million and $302 million distribution. Chapter 361 reallocates the entire surplus and contains a comprehensive cost-shifting provision.[1] See 1993 Minn.Sess.Laws ch. 361. The two retroactive provisions are section two and section four. Section two requires that insurer members of WCRA must refund the previously distributed $100 million excess to their 1992 policyholders (self-insured employer members may keep their portion). Id. Section four provides that the $302 million in undistributed surplus (less the amount payable directly to self-insured employer members) shall be paid directly to insured employers in shares proportionate to their 1992 premiums. Id. The cost-shifting provision, section ten, requires WCRA to pay all of the state's legal costs in the case of a legal challenge to the law. Id.
 
 
 6
 Unwilling to let the refund money slip through their fingers, various insurance companies challenged the constitutionality of Chapter 361's retroactive provisions and the cost-shifting provision. After consolidating the actions, the district court[2] granted summary judgment in favor of the insurance companies, holding that the retroactive application of Chapter 361 violates the Contract Clause and section ten violates the First Amendment. 842 F.Supp. 1211.
 
 
 7
 The Commissioners of the Minnesota Department of Labor and Industry and the Minnesota Department of Commerce appeal the district court's order.
 
 II. DISCUSSION
 A. CONTRACT CLAUSE
 
 8
 The insurance companies, as indicated, contend that the retroactive application of Chapter 361 unconstitutionally infringes upon their pre-existing contracts with WCRA. This retroactive application occurs because Chapter 361 affects both money previously distributed to the insurance companies and money already designated for distribution. The district court found that this impairment violated the Contract Clause.
 
 
 9
 Article I, section 10 of the United States Constitution prohibits states from enacting legislation which impairs existing contracts. In practical terms, state legislation violates the Contract Clause if: (1) the state law operates as a substantial impairment upon a contractual relationship, and (2) the state cannot demonstrate a significant and legitimate public purpose behind the regulation. Even if the state can demonstrate a significant and legitimate public purpose, the legislation may be invalid if the legislation's adjustment of the contracting parties' rights and liabilities is not based upon reasonable conditions or is not of a character appropriate to the public purpose justifying the legislation's adoption. Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 410-13, 103 S.Ct. 697, 703-06, 74 L.Ed.2d 569 (1983).
 
 1. Substantial Impairment
 
 10
 A determination of whether a substantial impairment exists involves a threepart inquiry: whether a contractual relationship exists; whether a change in law impairs that contractual relationship; and whether the impairment is substantial. General Motors Corp. v. Romein, 503 U.S. 181, 185-86, 112 S.Ct. 1105, 1109, 117 L.Ed.2d 328 (1992).
 
 
 11
 a. Contractual Relationship
 
 
 12
 A contractual relationship exists between the insurance companies and WCRA. The enabling act and three major WCRA documents--the Reinsurance Agreements, Operating Plan, and Operating Rules--allocate rights and responsibilities between the insurance companies and WCRA. See Minn.Stat. Secs. 79.34 subd. 1, 79.38, 79.36(e); Appellants' App. at A-134-144. The Operating Plan and Operating Rules do not purport to establish a direct relationship with the insurance companies. The Reinsurance Agreement between WCRA and each carrier expressly incorporates these documents by reference and makes them "controlling over the provisions of [the] Agreement." Appellants' App. at A-135. The Agreement is not intended to function independently from the enabling act, plan and operating rules. Id. Nonetheless, the Agreement, the plan and the rules each provide that WCRA will issue to or collect from the insurance companies special distributions or charges to reflect excesses or deficiencies in the reinsurance pool. The documents call the distributions "excess premiums." Together, these documents establish an enforceable agreement between WCRA and the insurance companies which at relevant times provided that the companies would receive excess premiums if there was unneeded surplus in WCRA's reinsurance pool.
 
 
 13
 b. Impairment
 
 
 14
 Chapter 361 retroactively changed the contractual provisions regarding excess collections by providing that certain employers, and not the insurance companies, would receive any "excess premiums" that accrued from 1979 to 1992. This change impairs the insurance companies' contractual relationship with WCRA only if the insurance companies had a reasonable expectation that they would receive any excess premiums that existed. Because the relevant documents provided that the companies would receive distribution of excess premiums, it logically follows that the insurance companies had a reasonable expectation of receiving such monies and any legislation retroactively redistributing such surplus funds impairs this relationship.
 
 
 15
 The Commissioners contend that this inference is flawed because: (1) the automatic amendment clauses in the documents provide notice of potential retroactive amendment and (2) the second distribution had not yet proceeded through all the prerequisites to distribution. We find these contentions insufficient to destroy the insurance companies' reasonable expectations.
 
 
 16
 All the plan documents contain a similar automatic amendment provision which expressly incorporates into the documents all amendments to Minnesota law as of the effective date of any amendment. For example, the Agreement of Reinsurance provides:
 
 
 17
 This Agreement shall be deemed to be automatically amended to conform to any amendment to the enabling act, other provisions of Minnesota law, the Plan, or the Operating Rules or to the adoption of other Minnesota law or Operating Rules after the effective date of this Agreement. Such automatic amendment to this Agreement shall be effective on the effective date of the amendment to the enabling act, other provisions of Minnesota law, Plan, or Operating Rule or the adoption of other Minnesota law or Operating Rules.
 
 
 18
 Appellants' App. at A-135. The Commissioners contend that these clauses destroy all reasonable expectations because the changeable nature of an amendable contract prevents impairment of such contract by amendment. In other words, they contend that the insurance companies were on notice that their contracts with WCRA could be retroactively changed. This contention is unsupported in the law. The cases which find that notice existed due to an automatic amendment provision address prospective, not retroactive, amendment and notice. See, e.g., Energy Reserves Group, 459 U.S. at 416, 103 S.Ct. at 707; Bowen v. Public Agencies Opposed To Social Sec. Entrapment, 477 U.S. 41, 55, 106 S.Ct. 2390, 2398, 91 L.Ed.2d 35 (1986).
 
 
 19
 This difference is critical. Unlike retroactive amendment, prospective amendment does not affect settled plans or arrangements. An expansive interpretation of the automatic amendment clause to permit complete retroactive amendment essentially deems all rights or obligations in those contracts illusory, because these rights could always be changed or obliterated. See Continental Illinois Nat'l Bank and Trust Co. v. Washington, 696 F.2d 692, 698 (9th Cir.), appeal dismissed, 460 U.S. 1077, 103 S.Ct. 1762, 76 L.Ed.2d 338 (1983). An expansive retroactive application also converts the automatic amendment clause into a blanket waiver of the insurance companies' right to Contract Clause protection. Contractual clauses purporting to waive constitutional rights must be clear and unambiguous. Fuentes v. Shevin, 407 U.S. 67, 95, 92 S.Ct. 1983, 2001-02, 32 L.Ed.2d 556 (1972).
 
 
 20
 The automatic amendment clauses here do not unambiguously divest all future rights for Contract Clause protection. As a result, we are hesitant to find that the clauses are waivers or that the clauses completely obliterate all contractual rights between WCRA and the insurance companies. Rather, we find that the most reasonable interpretation of the automatic amendment clauses is that they permit only prospective changes to the contractual relationship. The automatic amendment provision thus only amends the contracts as of May 25, 1993, the day after Chapter 361's final enactment. As a result, the automatic amendment clauses do not prevent contract impairment.
 
 
 21
 The automatic amendment issue aside, the Commissioners contend that the insurance companies had no reasonable expectations of receiving the second, or $302 million distribution because all the procedural prerequisites for distribution had not yet been met. For although the precise amount of the distribution was determined and set aside prior to the enactment of Chapter 361, the second distribution was not approved by the Commissioner before Chapter 361's effective date. This approval is the final prerequisite to distribution. See Minn.Stat. Sec. 79.35(d).
 
 
 22
 Without official approval, the Commissioners argue, the insurance companies did not have any reasonable expectations to the $302 million surplus. We disagree. After describing the procedure for distributing excess premiums to the WCRA members, the statute says only that "[a]ll premiums shall be approved by the commissioner of labor and industry." Id. It does not vest the Commissioner with any power to redesignate the recipient of the premiums. The Commissioner's approval is a discretionless act verifying only the existence of an excess or deficiency in premiums. Thus, the insurance companies had reasonable contractual rights to the second distribution before the Commissioner's approval. For reasonable contractual expectations to exist, it is not necessary that all acts are completed. In Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 247, 98 S.Ct. 2716, 2723-24, 57 L.Ed.2d 727 (1978), for example, the Supreme Court assumed a company's planned move created reasonable contractual expectations that could be disrupted before the move actually occurred.
 
 
 23
 In sum, we find that the retroactive application of Chapter 361 impairs the contractual relationship between WCRA and the insurance companies.
 
 
 24
 c. Substantial Nature
 
 
 25
 The existence of an impairment does not end our inquiry. For a Contract Clause violation to exist, the impairment must also be substantial. In making this determination, we consider the extent to which the insurance companies' reasonable contract expectations have been disrupted. Id. at 244-45, 98 S.Ct. at 2722-23. Reasonable expectations are affected by the regulated nature of an industry in which a party is contracting. Energy Reserves Group, 459 U.S. at 411, 103 S.Ct. at 704. Although a contract does not have to be completely nullified to be substantially impaired, heightened impairment triggers heightened scrutiny. Id.
 
 
 26
 To rebut the obviously substantial nature of an impairment which divests the insurance companies of their previously-settled right to millions of dollars, the Commissioners assert that the automatic amendment provision causes the insurance companies to expect change, the heavily-regulated nature of the workers' compensation industry prevents substantial impairment, and WCRA historically has not refunded excess surplus. As we have previously concluded that the automatic amendment provision does not put the insurance companies on notice of retroactive change, we will only address the Commissioners' other arguments here.
 
 
 27
 Heavy regulation of an industry may reduce reasonable expectations. Id. However, regulation does not automatically foreclose the possibility of contract impairment. Courts have found substantial impairment of contracts in heavily regulated areas of commerce. Allied Structural Steel, 438 U.S. at 250, 98 S.Ct. at 2725 (employee pensions); Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dept. of Public Welfare, 742 F.2d 442, 451 (8th Cir.1984) (nursing home rates), cert. denied, 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985); Holiday Inns Franchising, Inc. v. Branstad, 29 F.3d 383, 385 (8th Cir.) (franchise agreements), cert. denied, --- U.S. ----, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994).
 
 
 28
 We find that Minnesota's regulation of excess reinsurance premiums has not been sufficiently pervasive so as to destroy all reasonable contractual expectations. Critical to our determination is how concisely the regulated industry is defined. Although insurance, and workers' compensation coverage in particular, is heavily regulated, reinsurance premiums were basically unregulated prior to WCRA's enactment. WCRA's regulation scheme imposed an equitable distribution of excess premiums back to the insurance companies. This limited state action did not provide the insurance companies with a fair warning of an impending intervention into their contracts with WCRA. See Holiday Inns, 29 F.3d at 385. Thus, the previous regulation of premiums does not automatically render insignificant the insurance companies' claim to several million dollar distributions in a largely unregulated area.
 
 
 29
 The Commissioners also insist that the insurance companies cannot have any reasonable expectations of receiving the excess premiums because WCRA has not distributed any excess premiums during its decade-long existence. This argument has little merit. WCRA has a long-term obligation to preserve enough cash to fund excessive claims. Protracted litigation or latent injuries could result in an initial payment of some claims long after the initial injury. Such possibilities require long-term actuarial assumptions. It is not unusual that several years passed before WCRA could determine the appropriateness of a distribution. In addition, this historical "nonuse" argument rings false because WCRA has previously utilized part of the excess premium clause repealed by Chapter 361. In 1982, it collected an additional premium from the insurance companies to cover an increase in the prefunded limit of the reinsurance pool. This premium was collected under the same clause which permits distributions for overfunding in the reinsurance pool. Thus, the mere passage of fourteen years without a distribution of excess premiums does not eliminate the insurance companies' reasonable expectations.
 
 
 30
 In sum, the retroactive application of Chapter 361 substantially impairs WCRA's contracts with the insurance companies.
 
 
 31
 2. Significant and Legitimate Public Purpose
 
 
 32
 Since substantial impairment of contract exists, the Commissioners must demonstrate a significant and legitimate public purpose behind Chapter 361. Although states have broad discretion under their police powers to regulate existing contractual relationships, such regulation must protect a "broad societal interest rather than a narrow class." Allied Structural Steel, 438 U.S. at 249, 98 S.Ct. at 2724; See also Minnesota Ass'n of Health Care Facilities, 742 F.2d at 450. This requirement ensures that "the State is exercising its police power, rather than providing a benefit to special interests." Energy Reserves Group, 459 U.S. at 412, 103 S.Ct. at 705.
 
 
 33
 The Commissioners contend, and the district court assumed, that a significant and legitimate purpose exists behind Chapter 361. The statute's stated purposes--benefiting employers by lowering their costs and eliminating windfall profits--have been recognized as significant and legitimate public purposes. See 1993 Minn.Sess.Laws ch. 361, sec. 1.; Energy Reserves Group, 459 U.S. at 417, 103 S.Ct. at 707-08. Even when public welfare is invoked as a justification, however, the security of a contract cannot be cut down without "moderation or reason or in the spirit of oppression." Allied Structural Steel, 438 U.S. at 243, 98 S.Ct. at 2722 (citing W.B. Worthen Co. v. Kavanaugh, 295 U.S. 56, 60, 55 S.Ct. 555, 557, 79 L.Ed. 1298 (1935)).
 
 
 34
 The Minnesota legislature's stated purposes are suspect here. The first purpose of Chapter 361, benefiting employers, is not significant or legitimate because it is not achieved by retroactive redistribution of the reinsurance pool surplus. Despite its sweeping language about benefitting the broad societal interest or class, the statute's retroactive implementation benefits only a selected few. It does not benefit all Minnesota employers or even all Minnesota employers who pay workers' compensation insurance premiums. Instead, the retroactive sections provide benefits solely to employers who paid workers compensation insurance premiums in 1992. The Commissioners cite administrative ease in an attempt to justify this allocation. While this allocation may be simple, it does not create a broad societal class or interest.
 
 
 35
 The windfall profits justification is equally unpersuasive. The Commissioners contend that Chapter 361 prevents insurance companies from obtaining windfall profits from the refund. Permitting the insurance companies to receive the excess premiums they contracted to receive does not amount to a windfall profit. The insurance companies expected the refund. The only windfall affected by Chapter 361 is the one the statute itself creates by designating certain employers as recipients of the excess premiums. The employers had no expectations of receiving this money. The legislative finding at the beginning of Chapter 361 suggests that this windfall is justified because the employers are a more worthy recipient of the money. See 1993 Minn.Sess.Laws ch. 361, sec. 1. Legislative perception regarding the more worthy recipient does not render a complete divestiture of contractual rights a legitimate state interest.
 
 3. Conclusion
 
 36
 Retroactive application of Chapter 361 substantially impairs the contractual relationship between the insurance companies and WCRA. The Commissioners cannot demonstrate a significant and legitimate purpose for this redistribution. As such, we need not consider whether the legislation correctly apportions rights or whether it is of a character appropriate to the public purpose justifying its adoption. The statute's retroactive redistribution violates the Contract Clause of the Constitution. Because we find the retroactive application unconstitutional on these grounds, we do not reach the insurance companies' other arguments on this issue.
 
 B. FIRST AMENDMENT
 
 37
 The insurance companies also challenge the constitutionality of section ten, Chapter 361's cost-shifting provision. This section provides that WCRA must reimburse the state for all costs, including attorneys' fees, resulting from litigation involving the validity or enforcement of Chapter 361. This reimbursement occurs regardless of which party prevails in the litigation. Although the Commissioners have not yet attempted to enforce section ten, the district court found that this provision violated the insurance companies' First Amendment right to petition the courts. We agree.
 
 1. Ripeness
 
 38
 When determining whether a controversy is ripe for adjudication, courts consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Abbott Lab. v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).
 
 
 39
 The Commissioners argue that adjudication regarding section ten is not yet ripe because it has not yet been enforced. Section ten's payment provisions are mandatory, and no reason exists to believe that it will not be enforced. A small time delay before enforcement does not keep this controversy from being ripe. See Regional Rail Reorganization Act Cases, 419 U.S. 102, 143, 95 S.Ct. 335, 358, 42 L.Ed.2d 320 (1974).
 
 
 40
 The Commissioners also contend that no hardship to the parties will result if the court fails to hear this claim now. They reason that since WCRA is an independent entity, WCRA's responsibilities under section ten should not concern the insurance companies. The insurance companies will not directly pay all litigation costs out of their pockets. While the Commissioners' argument is technically correct, WCRA's status as an independent entity is misleading because WCRA's membership consists primarily of workers' compensation insurers, such as these insurance companies. They will ultimately shoulder any costs assessed upon WCRA. Section ten is ripe for adjudication.
 
 2. Standing
 
 41
 To have standing, a party must demonstrate injury in fact, causation, and redressibility. See Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 472, 102 S.Ct. 752, 758-59, 70 L.Ed.2d 700 (1982).
 
 
 42
 The Commissioners allege that the insurance companies do not have standing to challenge section ten because they do not suffer injury in fact. We disagree. Requiring WCRA to pay all costs of litigation ultimately results in an assessment upon the insurance companies. They, more than any other party, will bear the direct brunt of any costs imposed upon WCRA. Those costs will probably reduce the excess premiums to which the insurance companies are entitled. Thus, the insurance companies have standing to challenge the constitutionality of section ten.
 
 3. Right of Access to the Courts
 
 43
 The district court found that section ten placed an unconstitutional burden upon the insurance companies' right of access to the courts because section ten was enacted to forestall and encumber the inevitable lawsuits regarding Chapter 361's constitutionality. The Commissioners argue that section ten does not impermissibly burden access to the courts because it does not require the insurance companies themselves to directly pay the costs of litigation.
 
 
 44
 This court has recognized that government action designed to keep a citizen from initiating legal remedies sometimes infringes upon the First Amendment right to petition the courts. Harrison v. Springdale Water & Sewer Comm'n, 780 F.2d 1422 (8th Cir.1986). This right of court access cannot be impaired, either directly or indirectly. Id. at 1428. Indirect impairment may include "retaliatory action [taken] against an individual designed either to punish him for having exercised his constitutional right to seek judicial relief or to intimidate or chill his exercise of that right in the future." Id. Here, section ten acts at least as an indirect government impairment upon the insurance companies' right to petition the courts because it imposes a litigation penalty.[3] Requiring one party to pay the full cost of an action, regardless of who prevails, is a substantial deterrent to commencing litigation. An unconditional litigation penalty such as this is much harder to justify than a mere assessment of costs upon a losing party. The Commissioners cannot meet this burden of justification here.4. Conclusion
 
 
 45
 Because section ten creates an unjustified litigation penalty, it unconstitutionally infringes upon the insurance companies' right to petition the courts.
 
 III. CONCLUSION
 
 46
 For the foregoing reasons, the district court's judgment is affirmed.
 
 
 
 *
 The HONORABLE DANIEL M. FRIEDMAN, Senior Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation
 
 
 [1]
 Chapter 361 also prospectively changed the method for allocating excess monies. Those provisions are not at issue here
 
 
 [2]
 The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota
 
 
 [3]
 In Charles v. Daley, 846 F.2d 1057 (7th Cir.1988), cert. denied, 492 U.S. 905, 109 S.Ct. 3214, 106 L.Ed.2d 564 (1989), the Seventh Circuit found that assessment of costs upon non-liable intervenors does not violate the First Amendment. However, the statute at issue in Daley only authorized payments from an unsuccessful opposing party. Section ten requires WCRA to bear the entire cost of litigation regardless of Chapter 361's constitutionality. The Daley decision also partially rested on the valid statutory purposes of encouraging civil rights plaintiffs to enforce the civil rights laws. Id. at 1063. Such enforcement has traditionally been regarded as a highly significant purpose. It is not clear that section ten is supported by a facially nondiscriminatory reason, much less a highly significant purpose. The Commissioners' claim that section ten ensures that the entity responsible for the surplus, WCRA, bears all costs resulting from challenges to the distribution of the surplus. This purpose cannot legitimately be compared with the importance of enforcing the civil rights statutes. Daley does not justify the retaliatory action of section ten