# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00105-CV

**Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, and Liberty Insurance Corporation, Appellants**

**v.**

**Texas Department of Insurance and Jose Montemayor, as Commissioner of Insurance; Amber, Inc.; Champage-Webber, Inc.; Churchill Truck Lines, Inc.; and Royal Seating Corp., Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT NO. 97-08264, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING

## O P I N I O N

Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, and Liberty Insurance Corporation (hereinafter "the Liberty companies") contend that a rule issued by the Texas Department of Insurance (the "Department"), which required them to pass surpluses from the insurance market through to policyholders, deprived them of their contractual rights, deprived them of property without due process, and is an unconstitutional retroactive law. They appeal the judgment of the trial court requiring them to issue rebates to policyholders with policies effective in 1991 and 1992. We will affirm the judgment of the district court.

Since 1953, employers who were unable to find workers' compensation insurance coverage through an insurance company could obtain coverage from a program funded by all insurance companies selling workers' compensation insurance in Texas. In the 1980s, the program operated at a substantial deficit, which insurers were required to cover. In an effort to prevent insurance companies from leaving Texas, the Department issued emergency rules, which allowed insurers to pass through the deficits to policyholders. The legislature followed with a statute requiring insurers to pass through the deficits and surpluses originating from the program to policyholders.

Starting in 1991, the program experienced unexpected surpluses. Even though there was a surplus, some insurers continued to bill policyholders for non-existent program deficits. Upon learning this, the Department issued a letter prohibiting pass-throughs to policyholders. As a result, the practice stopped. However, in 1997, the Department issued a rule specifying that insurers were to pass through reinsurance surpluses for policies issued between 1991 and 1992.

Insurers, including the Liberty companies, sued the Department and sought a declaration that the rule issued in 1997 was invalid. Conversely, policyholders sued insurers seeking a proportionate share of the reinsurance surplus.

The Liberty companies, the Department, and the policyholders all moved for summary judgment. The district court granted the no-evidence summary judgment motions filed by the Department and by the policyholders and denied the Liberty companies' summary judgment motions. The Liberty companies appeal the granting of the Department's and the policyholders' no-evidence summary judgment and appeal the denial of their own motion.

2

## FACTUAL BACKGROUND

Before addressing the claims of the parties, we will give a brief overview of retrospectively-rated insurance policies. When parties contract for a typical insurance policy, the policyholder knows the amount of money that needs to be paid to the insurer, and the amount of money paid for the policy period does not change to account for actual losses the policyholder experienced. Donald Winslow, *A Note on Retrospectively Rated Insurance and Federal Income Taxation*, 79 Ky. L.J. 195, 195 (1991). However, insurance coverage for large businesses is not so simple. For large businesses, the amount of potential losses are much greater, and the policyholders are exposed to greater risks that are less predictable. *Id.* Because the potential risks are less predictable, the insurers and the policyholders will likely have different expectations over how the risks are to be allocated. *Id.* at 195-96.

Retrospectively-rated insurance policies are an attempt to accommodate the different expectations of insurers and policyholders. *Id.* at 196. These policies have flexible premium amounts to prevent policyholders and insurers from forsaking insurance agreements because the premiums are either too high to be affordable or too low to cover the losses covered. *Id.* Under a retrospectively-rated policy, a policyholder pays a premium that corresponds, to some degree, to the losses the policyholder experiences.

Generally, retrospectively-rated insurance policies have certain characteristics. First, the policyholder is given a bill for an initial, estimated premium at the start of each policy period. Mark G. Ledwin, *The Treatment of Retrospectively Rated Insurance Policies in Bankruptcy*, 16

3

Bank. Dev. J. 11, 12 (1999). After the end of the policy period, the insurer uses a formula to recalculate the premium charged based on actual claims experienced. *Id.*

Retrospectively-rated worker's compensation policies are available in Texas. The Texas workers' compensation market consists of a voluntary market and a residual market. The voluntary market is composed of employers, or policyholders, who are able to buy workers' compensation insurance, including retrospectively-rated policies, directly from an insurer.

Employers who are unable to buy workers' compensation insurance directly, or "rejected risks," form the residual market. During the 1980s, the Texas Workers' Compensation Assigned Risk Pool (the "Pool") operated the residual market. The Pool was the insurer of last resort for Texas employers who were unable to obtain workers' compensation insurance through the voluntary insurance market. *See* Act of May 14, 1953, 53d Leg., R.S., ch. 279, § 1, 1953 Tex. Gen. Laws 716, 716-18, *repealed by* Act of Dec. 11, 1989, 71st Leg., 2d C.S., ch. 1, § 16.01 (21), 1989 Tex. Gen. Laws 1, 114-15 (hereinafter "Act of May 14, 1953"); *see also Texas Worker's Comp. Ins. Facility v. Comptroller of Pub. Accounts*, 67 S.W.3d 417, 420 (Tex. App.—Austin 2002, no pet.); *see generally Butler Weldments Corp. v. Liberty Mut. Ins. Co.*, 3 S.W.3d 654, 656 (Tex. App.—Austin 1999, no writ) (generally explaining workers' compensation system and insurer of last resort history).

All insurers writing workers' compensation insurance in Texas belonged to the Pool. *Butler Weldments*, 35 S.W.3d at 656. An employer who was seeking insurance but was unable to obtain coverage in the voluntary market would submit an application to the Pool, and a policy would be issued by one of the insurers that was a member of the Pool. However, the financial burden for

4

covering the employer would not fall solely on the insurance company issuing the policy. Rather, all insurers belonging to the Pool were required to pay a portion of the losses the Pool incurred. *See* Act of May 14, 1953, § 1 (stating that "[i]t shall be the duty of companies and associations, [that is,] members of the [Pool] . . . to provide insurance . . . for any risk under the Workmen's Compensation Law of Texas . . . which risk shall have been tendered to and rejected by any member of [the Pool]"). The portion of the loss an insurer was required to pay corresponded to the insurer's share of the voluntary market. *See* Act of May 14, 1953, § 1; *see also Butler Weldments Corp.,* 3 S.W.3d at 656.

The Pool's financial responsibilities were transferred to the Texas Workers' Compensation Assigned Risk Facility (the "Facility") in 1991, to the Texas Workers' Compensation Insurance Fund (the "Fund") in 1994, and ultimately to the Texas Mutual Insurance Company in 2001.[1]

During the late 1980s, the Pool had a total deficit of approximately $2 billion because the residual market claims greatly exceeded the premiums collected for the policies. This deficit was passed on to insurers.

In response to the deficit, some insurers began to pass their share of the deficit on to their policyholders in the voluntary market. However, after discovering this practice, the Commissioner demanded that insurers stop the practice. After receiving the Commissioner's demand, some insurers threatened to leave the state.

---

[1] *See* Act of Dec. 11, 1989, 71st Leg., 2d C.S., ch. 1, § 17.09, 1989 Tex. Gen. Laws 1, 117; Act of Aug. 25, 1991, 72d Leg., 2d C.S., ch. 12, § 18.24, 1991 Tex. Gen. Laws 252, 362; Tex. Ins. Code Ann. art. 5-76-3 (West Supp. 2005).

**Board Amendments**

In response to insurers' threats to leave, the Board issued emergency rating rules in 1991 that amended Part Two of the Texas Retrospective Rating Plan Manual (the "Manual") and allowed insurers to pass a portion of the deficit on to policyholders. *See* Tex. Ins. Code Ann. arts. 5.62, 5.77 & 5.96 (West 1981 & Supp. 2005) (giving authority to amend and promulgate rules, rating plans, and policy forms). The amendments added a new component to the formula used in calculating the total premiums for retrospectively-rated workers' compensation policies: the residual market premium. The residual market premium is the amount of money insurers would charge their policyholders after the Facility's operating expenses were passed on to the insurers. To determine the amount of residual market premium to charge policyholders, insurers would apply a residual market factor issued by the State Board of Insurance ("the Board").[2]

The first amendment went into effect on May 1, 1991, and governed the pricing of policies issued from May 1, 1991 to June 6, 1991. *See* Tex. Ins. Code Ann. art. 5.96(I) (authorizing Board to take emergency action). The amendment provided for the issuance of an initial residual market factor, based on projected residual market costs, and a final factor based on the actual residual market deficit for the calendar year. The amendment also stated that the final factor would be used in making all future adjustments of the premium. In relevant part, the rule provided as follows:

> An initial residual market factor (RMF) shall be promulgated annually by the State Board of Insurance based on projected residual market costs for that calendar year.

---

[2] The State Board of Insurance is now called the Texas Department of Insurance.

A final RMF shall be determined by the State Board of Insurance at the time the actual residual market deficit is declared for each calendar year. The final RMF shall be used in making all future adjustments under the plan.

To calculate the premiums under a retrospective policy governed by this rule, insurance companies would need two residual market factors: the 1991 and the 1992 factors. The amendment required that residual market factors be applied on a calendar year basis prorated to the policy year when making the residual premium calculation. In other words, for an annual policy effective on or after May 1, 1991, the residual market factor for 1991 would apply to the months the policy was effective in 1991 and the 1992 factor would apply to the months the policy was effective in 1992.[3]

On June 7, 1991, the second amendment to the Manual became effective and governed insurance policies issued from June 7, 1991, through October 31, 1991. It too instructed the Board to determine a residual market factor to be used in calculating the residual premium to be collected from policyholders. Specifically, the rule provided:

> The actual [residual market factor] determined by the [Board] shall be calculated by either dividing the actual assessed Texas [Workers' Compensation] Residual Market deficit by the total Texas [Workers' Compensation] voluntary written premium for

---

[3] The actual language of the amendment reads as follows:

> Both residual market factors are to be applied on a calendar year basis prorated to the policy year. For example, if a policy is effective 05-01-91, the residual market factor effective 01-01-91 would apply from 05-01-91 through 12-31-91 and the residual market factor effective 01-01-92 would apply from 01-01-92 through 04-30-92.

This language does not appear in the subsequent emergency rules.

7

the year to which the deficit assessment relates or by any other formula adopted by the State Board of Insurance.

On November 1, 1991, the third amendment became effective, governing policies issued from November 1, 1991, to December 30, 1991. As with the second amendment, the third instructed insurers to calculate policyholders' premiums using a residual market factor determined by the Board when the actual residual-market deficit for the year was declared. The relevant portion of the rule provides as follows:

> The actual [residual market factor] determined by the State Board of Insurance shall be calculated by dividing the actual assessed Texas [Workers' Compensation] residual market deficit by the total Texas [Workers' Compensation] voluntary written premium for the year to which the deficit assessment relates.

The final amendment to the Manual became effective on December 31, 1991, and applied to policies issued on or after December 31, 1991. It was instituted in response to a petition from the deputy commissioner of insurance asking the Board to amend the Manual in order to comply with alterations to the insurance code that would take effect on January 1, 1992. In this amendment, the Department changed the residual market calculation to read as follows:

> RMF=[1-(Basic Premium[4] / Total Retro Premium)] x (Actual Assessed Residual Market Deficit / Total Assessable Voluntary Premiums Written)

The Manual was also amended as follows:

---

[4] The various amendments refer to different types of premiums. First is the standard premium, which is the premium an insurance company would charge if the policyholder chose to purchase a regular, non-retrospective, policy. Basic premium is less than the standard premium and is an amount charged in a retrospective policy.

8

The [residual market factor] for the accident year will be updated annually by the State Board for four years to reflect any change in the assessments levied for that accident year.

The [residual market factor] which is applicable to the first retrospective premium adjustment shall be updated annually through the fourth retrospective premium adjusted, provided the retrospective plan remains open, to reflect any change in the assessments levied for that accident year. The [residual market factor] at the fourth adjustment shall apply to all subsequent retrospective premium adjustments, if any, until the plan is finalized.

**Legislative Enactments**

After the amendments had been implemented, former article 5.76-2, section 4.04 of the insurance code (the "1992 statute") became effective on January 1, 1992. Act of Dec. 11, 1989, 71st Leg., 2d C.S., ch. 1, § 13.11(a), 1989 Tex. Gen. Laws 1, 94, *amended by*, Act of Aug. 25, 1991, 72d Leg., 2d C.S., ch. 12, § 18.13, 1991 Tex. Gen. Laws 252, 345-46 (hereinafter "former art. 5.76-2"), *repealed by*, Act of June 1, 1997, 75th Leg., R.S., ch. 594, § 3.01, 1997 Tex. Gen. Laws 2076, 2081. The 1992 statute required a pass-through of Facility surpluses and deficits to policyholders via a two-step process and contained separate provisions governing policies effective before January 1, 1992, and on or after January 1, 1992. Former art. 5.76-2, § 4.04.

The first step was explained in subsections (b) and (c) of section 4.04. *Id.* Subsection (b) addressed policies effective before 1992, while subsection (c) addressed policies effective on or after January 1, 1992. Under subsections (b) and (c), the Facility was instructed to calculate the deficit or surplus from its operational costs. *Id.* § 4.04(b), (c). Then, each insurer that was a member of the Facility was required to either pay a proportion of the Facility's deficit or receive a proportion

9

of the surplus. *Id.* The proportion paid or received was based on the member's pro rata share of the total voluntary workers' compensation insurance premiums for the calendar year in question. *Id.*

The second step was described in subsections (d) and (e) of section 4.04. *Id.* § 4.04(d), (e). Subsection (d) addressed policies effective before 1992, while subsection (e) addressed policies effective on or after January 1, 1992. Under subsections (d) and (e), any surplus or deficit charged to a Facility member was to be passed through to each retrospectively-rated policyholder in the voluntary market according to the amount of premium the policyholder had paid. *Id.* Subsection (d), in relevant part, provided:

> For assessments or rebates made under Subsection (b) of this section, the board shall establish an appropriate pass-through allowance so that each retrospectively rated risk written during the calendar year shall pay a portion of the assessment or receive a proportion of the rebate. The pass-through allowance shall be based on the premium paid by the retrospectively rated risk as a proportion of the total voluntary writings by the insurance carrier in the calendar year . . . .

*Id.* § 4.04(d). Subsections (d) and (e) contained nearly identical language with one notable distinction: subsection (d) contained an additional sentence that stated, "A pass-through allowance may not be permitted under this subsection after January 1, 1994" for policies effective before 1992.

The residual market produced an unexpected surplus for policies written in 1991 and 1992. *See Butler Weldments Corp.*, 3 S.W.3d at 657. The surplus was the first surplus in 35 years. Because there was a surplus, workers' compensation insurance carriers began receiving rebates of Facility surpluses instead of assessments for Facility deficits.

Although they began receiving surpluses, some insurers continued to bill policyholders for residual market deficits that did not exist. In 1993, when the Department learned

of this practice, the Deputy Commissioner issued circular letter 651,[5] which adopted a 0% residual market factor for calendar years 1991 and 1992. By instructing insurers to use a residual market factor of 0%, the Department effectively prevented insurers from continuing to charge policyholders for the nonexistent Facility deficits.

The letter addressed four groups of policies. First the letter specified that, for policies with effective dates from May 1, 1991, through June 6, 1991, "the final residual market factors of 0% must be used in making all retrospective premium adjustments for those policies."[6] Second, the letter specified that policies with effective dates from June 7, 1991, through December 30, 1991, "the actual residual market factor is 0%." Third, the letter stated that for policies effective December 31, 1991, the residual market factor was 0% for the first two adjustments and would be updated annually for two years. Finally, the letter specified that for policies issued during 1992, "the residual market factor to be applied at the first retro adjustment is 0% and will be updated annually for three more years." However, no updates to the residual market factor occurred in the three years after the letter was issued.

After letter 651 was issued, employers complained that using a residual market factor of 0% allowed insurers to keep the surplus issued by the Facility. In support of this complaint, they

---

[5] Circular letters are used to notify insurers of changes or developments adopted by the Department.

[6] Because of the different language used in the amendments, the letter referred a "final" residual market factor for policies effective between May 1, 1991, and June 6, 1991, but referred to an "actual" residual market factor for policies effective between June 7, 1991, and December 30, 1991. Under the first amendment, the Board was required to issue an initial factor, which was based on projected market costs, and a final factor, which was based on the actual residual market results. The second and third amendments only required the Board to issue a factor based on the actual residual market results.

11

pointed to subsections 4.04(d) and (e) of the statute, which required pass-throughs of Facility surpluses to policyholders.

**The 1997 Rule**

On July 21, 1997, the Commissioner issued order 97-0738 ("the 1997 rule"), which corrected *nunc pro tunc* an order previously issued. The order amended the Manual and required insurers to pass through Facility surpluses to policyholders with policies for years 1991, 1992, and subsequent years.

The first subsection of the new rule addressed policies with effective dates between May 1, 1991 and December 31, 1991. The rule stated that the Department will publish a residual market factor for 1991, which insurers are required to use in calculating the amount of residual market premium to either return to or collect from policyholders and specified the formula for calculating the factor. The rule also stated that, since the Facility reported a surplus for 1991, retrospective policyholders with policies effective from May 1, 1991 to December 31, 1991 are entitled to a proportionate share of the surplus. The commentary accompanying the rule stated that the January 1, 1994 deadline specified in the 1992 statute was not a deadline for the issuance of a residual market factor but an accounting deadline for a determination of whether there was a surplus or deficit in the residual market. In other words, when the Department calculated whether there was a surplus or deficit in the residual market for 1991 and calculated the corresponding residual market factor, it could not consider expenses, including claims made against 1991 policies, that occurred in 1994 or in subsequent years.

The second subsection addressed policies issued between January 1, 1992, and December 31, 1994. As with the first subsection, this subsection required the Department to issue a residual market factor for 1992, 1993, and 1994; provided a formula for calculating the residual market factor; and instructed insurers to calculate the residual market premium for each policyholder using the residual market factor. Because there was a surplus for 1992, the rule instructed insurers to calculate the rebate to be given to policyholders with policies effective between January 1, 1992 and December 31, 1992.

After the 1997 rule was issued, the Department issued circular letter 686-A specifying residual market factors to be used in the determination of the amount of pass-through to be issued to 1991 and 1992 policyholders. Unlike the previous factors of 0% specified in letter 651, which required no pass-through be given to policyholders, the new factors required insurers to pay a rebate to policyholders. The letter explained that the factors were based on the operating results of the Facility. The letter also stated that the residual market factor for 1992 might change if there were future changes in the Facility's operating results and that the 1992 factor was based on operating results through the end of 1995.[7] Insurers were instructed to calculate and issue the rebate to policyholders no later than 180 days after the effective date of the rule.

_____

[7] Because the statute and rule did not provide a deadline for determining pass-throughs for policies effective in 1992, the residual market factor for 1992 might change from year to year. Claims under the 1992 policies may be made years after the policy period has ended due to lengthy litigation, latent injuries, or other causes, which would affect the operating expenses of the Facility and, accordingly, the surpluses or deficits passed through to insurers and to policyholders.

## PROCEDURAL HISTORY

In 1997, sixty-three insurers, including the Liberty companies, sued the Department and the Commissioner, asking the district court to declare that the 1997 rule and the residual market factor specified in circular letter 686-A were invalid. Around the same time, policyholders alleging a putative class sued approximately 200 insurers, seeking the surplus and a declaration that the order was valid.

In an order denying the insurers' motion for temporary injunction, the district court made the following findings and conclusions: (1) letter 651 was issued only to prevent insurers from charging for non-existent deficits, did not constitute a rule or regulation, and was not adopted by the Board or the Commissioner under the insurance code; (2) section 4.04 of article 5.76-2 required the Department to issue residual market factors that corresponded to the operational results of the residual market to be used in calculating retrospective premiums; (3) the 0% factors listed in letter 651 were not the residual market factors the Department was required to issue because they did not require insurers to pay policyholders a portion of the residual market surplus; (4) the 1992 statute advances the public interest by spreading the costs and benefits of the residual market among policyholders in the voluntary market; (5) the 1997 rule is not an unconstitutional retroactive law; and (6) the insurers do not have a vested right to the 1991 or 1992 surpluses.

Both the insurers' and the policyholders' suits were consolidated. After consolidation, all the insurers except the Liberty companies settled with the policyholders, the Department, and the Commissioner. The Liberty companies paid $13,454,036 to the policyholders before the deadline listed in letter no. 686-A under protest.

14

After paying the pass-through, the Liberty companies entered into a partial settlement agreement. The agreement provided for the certification of a mandatory litigation class composed of employers who had purchased retrospectively-rated policies from the Liberty companies sometime between May 1, 1991, and December 31, 1992. Amber, Inc., Champagne-Webber, Inc., Churchill Truck Lines, Inc., and Royal Seating Corp. (the "policyholder appellees") are retrospectively-rated policyholders who purchased workers'compensation insurance policies from one of the Liberty companies during the relevant time period and were certified as class representatives.

The Liberty companies, the Department, the Commissioner, and the policyholder appellees all moved for summary judgment. The district court signed a final judgment that (1) denied the Liberty companies' motion for summary judgment and (2) granted the no-evidence summary judgment motions of the Commissioner, the Department, and the policyholder appellees. *See* Tex. R. Civ. P. 166a(a), (i). The Liberty companies appeal and ask the Court to reverse the judgment of the district court and render judgment in their favor.[8]

## STANDARD OF REVIEW

A no-evidence summary judgment is essentially a directed verdict granted before trial, to which we apply a legal-sufficiency standard of review. *Perdue v. Patten Corp.*, 142 S.W.3d 596, 603 (Tex. App.—Austin 2004, no pet.) (citing *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742,

---

[8] The Liberty companies seek a judgment stating the following: (1) that the 1997 rule and the residual market factors specified in letter 686-A are invalid as applied to policies with effective dates from May 1, 1991, to December 30, 1992; and (2) that the factors listed in letter 651 for these policies are valid.

750-51 (Tex. 2003); *Jackson v. Fiesta Mart, Inc.*, 979 S.W.2d 68, 70 (Tex. App.—Austin 1998, no pet.)).  In reviewing a no-evidence summary judgment, the court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within the realm of reasonable disagreement.  *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005).  In conducting a legal-sufficiency review, the court must credit favorable evidence if a reasonable juror could and disregard contrary evidence unless a reasonable juror could not.  *Id.* at 827-28.  The test for legal sufficiency is whether the evidence would enable reasonable people to reach the judgment being reviewed.  *Id.*

When both sides move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review the summary-judgment evidence presented by both sides and determine all questions presented.  *Commissioners Court of Titus County v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997).  The reviewing court should render the judgment that the trial court should have rendered.  *Id.*

Issues of statutory construction are questions of law and are reviewed *de novo*.  *In re Forlenza*, 140 S.W.3d 373, 376 (Tex. 2003).  Administrative rules are ordinarily construed in the same way as statutes.  *El Paso County Hosp. Dist. v. Texas Health & Human Servs. Comm'n*, 161 S.W.3d 587, 591 (Tex. App.—Austin 2005, pet. filed); *see also Central Texas Nudists v. County of Travis,* No. 03-00-00024-CV, 2000 Tex. App. LEXIS 8136, at *3 (Austin Dec. 7, 2000, pet. denied) (not designated for publication) (constitutionality of a rule raises question of law reviewed de novo).  The constitutionality of a statute is a question of law, which appellate courts review de novo.  *In re C.P.J.*, 129 S.W.3d 573, 576 (Tex. App.—Dallas 2003, pet. denied).

DISCUSSION

On appeal, the Liberty companies contend that the 1997 rule and the residual market factors specified in letter 686-A are invalid because (1) they violate both the federal and the Texas constitutions by impairing the contractual obligations existing under their 1991 and 1992 policies; (2) they deprive the companies of their property without due process of law; and (3) they violate the Texas Constitution's prohibition against retroactive laws. Although the Liberty companies listed the federal and Texas contract issues separately, we will discuss them in the same section because they are related. Further, we will address the retroactive issue first, and then address the remaining two issues.

**Retroactive Legislation**

In their final issue on appeal, the Liberty companies insist that the 1997 rule and the market factors specified in letter 686-A violate the prohibition against retroactive legislation found in the Texas Constitution as applied to policies effective in 1991 and 1992. The Texas Constitution, unlike the federal constitution, specifically prohibits retroactive laws. *See Texas Water Rights Comm'n v. Wright*, 464 S.W.2d 642, 648-49 (Tex. 1971). It provides that "[n]o bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts shall be made." Tex. Const. art. I, § 16. The retroactive prohibition is not absolute and must yield to the State's responsibility to safeguard the public welfare. *State Bd. of Registration for Prof'l Eng'rs v. Wichita Eng'g Co.*, 504 S.W.2d 606, 608 (Tex. Civ. App.—Fort Worth 1973, writ ref'd n.r.e.).

When determining if an agency order constitutes an impermissible retroactive law, two questions must be considered. *See Southwestern Bell Tel. Co. v. Public Util. Comm'n*, 615

S.W.2d 947, 953 (Tex. Civ. App.—Austin 1981), *writ ref'd n.r.e.*, 622 S.W.2d 82 (Tex. 1981) (per curiam). First, we must determine whether the statute authorizing the order is intended to allow the agency to issue a rule with retroactive effect. *See id.* at 953. This condition is satisfied here because the 1992 statute specifies that the Board is required to establish an appropriate pass-through for policies written before and after January 1, 1992, the effective date of the statute. *See* former art. 5.76-2, § 4.04(b)-(e); *see also Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 633 (Tex. 1996) (statute that authorizes agency to consider conduct occurring before statute's effective date has retroactive effect).

The second question is whether the order is constitutionally objectionable. *See Southwestern Bell*, 615 S.W.2d at 953. A retroactive law violates the Texas Constitution when the law deprives parties of a vested right. *See State v. Project Principle, Inc.*, 724 S.W.2d 387, 390 (Tex. 1987); *Southwestern Bell*, 615 S.W.2d at 956. A right becomes vested when there is "more than a mere expectation based on an anticipation of the continuance of an existing law; it must have become a title, legal or equitable, to the present or future enforcement of a demand." *Aetna Ins. Co. v. Richardelle*, 528 S.W.2d 280, 284 (Tex. App.—Corpus Christi 1975, writ ref'd n.r.e.). When determining whether a law retroactively impairs a vested right, the court must consider (1) whether the law advances or retards the public interest; (2) whether the retroactive portion of the law gives effect to or defeats the bona fide intentions or reasonable expectations of affected persons; and (3) whether the law surprises people who have relied on contrary law for a long period of time. *Southwestern Bell*, 615 S.W.2d at 956-57.

18

The Liberty companies insist that the issuance of letter 651 gave them a vested right to retain surpluses for the 1991 and 1992 calendar years. In support of this argument, the Liberty companies claim that circular letters have the effect and force of law and that if they had not complied with the requirements specified in letter 651, they would have been subject to some kind of enforcement action.

Because various amendments were being implemented, we will address different policy time periods. First, we will address the policies issued between May 1 and December 30, 1991, and governed by the first three amendments. Next, we will address policies issued on the effective date of the fourth amendment, December 31, 1991, and in 1992.

Regarding policies issued between May 1 and December 31, 1991, letter 651 stated that a residual market factor of 0% must be used in making premium adjustments. The Liberty companies claim that the 0% factor specified for these policies comported with the requirements of the first three amendments. They contend the emergency amendments governing these policies only allowed for the issuance of a single residual market factor without the possibility of a subsequent readjustment.[9] The Liberty companies also assert that none of the amendments allowed for the pass-through of Facility surpluses, only deficits. In addition, they contend that the 1992 statute does not apply to the 1991 policies, despite the statutory language addressing policies effective before 1992, because the policies were entered before the effective date of the statute and cannot justify the

_____

[9] In further support of their assertion that the final residual market factor could not be readjusted, the Liberty companies point to a letter written by an employee of the Department to an insurer, specifying the employee's belief that the residual market factor would not be readjusted.

19

application of the 1997 rule to 1991 policies.[10]  Therefore, they insist they have a vested right to retain the 1991 residual market surplus.  Alternatively, the Liberty companies contend that they have a vested right to the 1991 surplus because the 1992 statute prohibited the Board from issuing a residual market factor for the 1991 policies after January 1, 1994.  Therefore, the Liberty companies insist that the 1997 rule's directive that a proportionate share of the surplus be given to 1991 policyholders is invalid.

Regarding policies effective December 31, 1991, letter 651 stated that a residual market factor of 0% was to be used in the first two retrospective adjustments and that the factor would be updated annually for two years.  For policies issued during 1992, the letter stated that a 0% factor was to be used for the first adjustment but would be updated annually for three years.  No updated factors were issued for either group of policies.  Further, the fourth amendment, which applied to policies issued on or after December 31, 1991, specified that the residual market factor issued by the Department would be updated annually for four years and that the fourth update would be used in all future adjustments until the plan was finalized.  Because different factors were not issued annually as specified in letter 651 and in the amendment and because the fourth adjustment

---

[10]  In support of this argument, the Liberty companies point to language in the commentary accompanying the 1997 rule stating that the 1991 amendments were adopted to pass through Facility deficits, were written with the anticipation that continued deficits would be incurred, and were not amended to pass through surpluses until the 1997 rule.  They also point to a letter written by an employee of the Department stating that pass-throughs for policies effective May 1, 1991 and after were authorized if the Facility incurred a deficit and point to another letter written by a Department employee stating that any "adjustment to a policy effective since May 1, 1991 would be based on rules in effect as of the actual effective date of the policy."  Finally, they point to similar language in *Butler Weldments Corp. v. Liberty Mutual Insurance Co.*, in which this Court concluded that the 1991 amendments did not address the possibility of Facility surpluses.  3 S.W.3d 654, 657 n.4 (Tex. App.—Austin 1999, no pet.).

period described in the amendment had passed when the 1997 rule and letter 686-A were issued, the Liberty companies insist that the 0% factors in letter 651 constituted the final factors the Board was required to issue under the fourth amendment. Therefore, they insist that they obtained a vested right to retain the surpluses corresponding to this time period.

We disagree. The issuance of letter 651 did not give the Liberty companies a vested right to the surpluses. First, letter 651 was not an agency rule. *Cf. Board of Regents of State Colleges v. Roth*, 408 U.S. 546, 577 (1972) (property interests created and defined by rules and statutes). Letter 651 was written by deputy commissioner Moore after being informed that insurers were still charging policyholders for Facility deficits even though the Facility was actually experiencing surpluses. The letter did not satisfy any of the requirements listed in the Administrative Procedure Act ("APA") necessary for the issuance of a rule. *See Unified Loans, Inc. v. Pettijohn*, 955 S.W.2d 649, 650-51 (Tex. App.—Austin 1997, no pet.) (rule invalid if not adopted in substantial compliance of APA). The Department did not issue and did not publish in the Texas Register a notice announcing its intention to issue a rule. Tex. Gov't Code Ann. § 2001.023(a), (b) (West 2000).[11] Further, interested parties were not given the opportunity to request a public hearing nor were they given an opportunity to comment before the letter was issued. *Id.* § 2001.029(a), (b) (West 2000).

---

[11] The notice must contain a brief description of the rule, the text of the rule, a statement explaining the statutory authority authorizing the rule, a note explaining the estimated cost of enforcing the rule, a note explaining the costs to parties forced to comply with the new rule and benefits to the public of adopting the rule, and a request for comments from interested parties. Tex. Gov't Code Ann. § 2001.024(1)-(7) (West 2000).

Also, the residual market factors specified in letter 651 did not satisfy the requirements specified in the amendments or the 1992 statute. The emergency amendments specify that the Board will issue a residual market factor that is based on residual market results for the year. Although the amendments used the word "deficits" because only deficits were anticipated, the amendments tied the market factors to operations in the residual market. Similarly, subsections (d) and (e) of the 1992 statute require the Board to establish an "appropriate pass-through allowance so that each retrospectively-rated risk . . . shall pay a proportion of the assessment or receive a proportion of the rebate." Former art. 5.76-2, § 4.04(d), (e). The factors specified in letter 651 did not correspond to the actual operations of the residual market and, therefore, could not have represented the "appropriate" factors the Board was charged with implementing. *Cf. Butler Weldments*, 3 S.W.3d at 660 (every word in statute has a purpose).

Additionally, for policies issued between December 31, 1991 and the end of 1992, the fourth amendment does not say that if a residual market factor is not issued by the fourth adjustment period, no factor could ever be issued. Rather, the amendment says that the residual market factor at the fourth adjustment will apply to all future adjustments until the plan is finalized. When the Department issued the 1997 rule, the plan was finalized, and the residual market factor was appropriately issued shortly after.[12]

---

[12] Even if we were to adopt the Liberty companies' argument, only policies issued on December 31, 1991, would be affected by this because policies issued on January 1, 1992 or later were governed by the 1992 statute. The 1992 statute does not provide a time limit for the issuance of a residual market factor for 1992 policies, and, if we were to construe the amendment as imposing a time limit, then the amendment would be inconsistent with the statute and would be inoperative to policies issued on or after the effective date of the statute, January 1, 1992. *See* former art. 5.76-2, § 4.04(e); *see also Riess v. Appraisal Dist.*, 735 S.W.2d 633, 638 (Tex. App.—Austin 1987, writ

Further, the 1997 rule advances the public interest. The amendments were issued after insurers had threatened to leave Texas. In an attempt to preserve the workers' compensation market, the Department issued amendments that relieved insurers of the obligation of financing the residual market. The amendments were written after years of deficits in the residual market. The 1997 rules and the factors listed in letter 686-A implement the 1992 statute's equitable directive that Facility deficits and surpluses were to be passed on to policyholders, including 1991 and 1992 policyholders. Allowing insurers to retain Facility surpluses but pass on Facility deficits would be contrary to the public interest and would reward insurers at the expense of policyholders.

Similarly, the insurers could not have had reasonable expectations that they would be able to retain the Facility surpluses. The amendments allowed a pass-through of Facility expenses, and the 1992 statute, written in 1991, required a pass-through of Facility surpluses or deficits. Because insurers were relieved of the financial obligation of covering the Facility's expenses, they could not reasonably expect to retain the surpluses. On the contrary, policyholders, faced with the prospect of having to cover Facility costs, would reasonably expect that they would also be allowed to share in any surplus.[13] The 1997 rule gave effect to the reasonable expectations of both insurers and policyholders.

---

denied) (agency may not impose additional burdens inconsistent with statute).

[13] As the obligated parties, policyholders possessed an expectation to the surpluses. This expectation turned into a vested right when the Department issued its 1997 rule and the letter specifying the actual residual market factors to be used based upon actual residual market costs. *See Butler Weldments Co. v. Liberty Mutual Insurance Co.*, 3 S.W.3d 654, 659 (Tex. App.—Austin 1999, no pet.).

Finally, there was no prior law upon which the insurers had long relied allowing the insurers to pass through deficits but retain surpluses. The 1997 rule is unlikely to have surprised insurers because it was known that the obligation of funding the Facility had been shifted and that there was an unexpected surplus.

We do not agree with the Liberty companies' alternative contention that the 1992 statute prohibited pass-throughs for the 1991 policies. In support of their argument, they highlight the last sentence of section 4.04(d), which states "a pass-through allowance may not be permitted under this subsection after January 1, 1994." However, when determining legislative intent, the entire act, not isolated portions, must be considered. *City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 25 (Tex. 2003). When subsection (d) is read in light of the remainder of section 4.04, which emphasizes the need to pass through Facility surpluses or deficits, the deadline specified is not a deadline for the issuance of a residual market factor; rather, the deadline refers to an accounting cut off that limits the information that may be included when calculating the surplus or deficit for 1991. Accordingly, the Department could issue a residual market factor to pass through Facility surpluses or deficits determined for policies issued in 1991 after January 1, 1994.

We hold that the 1997 rule and the factors specified in letter 686-A do not violate the prohibition against retroactive legislation. Accordingly, we overrule the Liberty companies' third issue on appeal.[14]

---

[14] Alternatively, for all the reasons already stated, the 1997 rule is a valid exercise of legislative power. The rule equitably implements the scheme specified in the 1992 statute and the amendments that were implemented to save the workers' compensation market. A "valid exercise of the police power by the legislature to safeguard the public safety and welfare of the public can prevail over a finding that the law is unconstitutionally retroactive." *Cf. Barshop v. Medina County*

**Contracts Clause**

In their first issue on appeal, the Liberty companies assert that the 1997 rule unconstitutionally impairs the obligations under their 1991 and 1992 policies. Both the federal and the Texas Constitutions provide protection from the impairment of contractual obligations. U.S. Const. Art. I, § 10, cl. 1; Tex. Const. Art. I, § 16. Both prohibitions are interpreted nearly identically. *Chandler v. Jorge A. Gutierrez, P.C.*, 906 S.W.2d 195, 203 (Tex. App.—Austin 1995, writ denied). Although the prohibitions listed in the contracts clauses of both constitutions are "facially absolute," the prohibitions must be reconciled with the power of the state to safeguard the interests of the public. *See Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410 (1983); *State Bd. of Registration for Prof'l Eng'rs*, 504 S.W.2d at 608.

Determining whether there has been a violation of the contracts clause under the federal constitution involves several considerations. First, a court must determine whether the state law has, in fact, operated as a substantial impairment of the contract. *Energy Reserves Group*, 459 U.S. at 411. Regulations that restrict parties to profits they reasonably expected from the contract do not necessarily qualify as substantial impairments. *Id.*; *City of El Paso v. Simmons*, 379 U.S. 497, 515 (1965) (law not subject to attack under the contracts clause if it restricts party to gains it reasonably could have expected from contract). One factor to consider when making this

---

*Underground Water Conservation Dist.*, 925 S.W.2d 618, 633-34 (Tex. 1996) (Edward's Aquifer Act imposed cap on water withdrawal for preexisting users that was based on previous consumption and that was different than the cap placed on new users; court concluded that, because Act necessary to general economy and welfare of the state, retroactive effect resulting from consideration of actions occurring before effective date of Act did not render Act unconstitutional).

25

determination is whether the industry the complaining party belongs to has been regulated in the past. *See Energy Reserves Group,* 459 U.S. at 411.

If there is a substantial impairment, the court must then determine if there is a significant and legitimate public purpose behind the regulation, such as remedying a broad economic problem. *See id.* at 411-12. A legitimate public purpose is necessary to ensure the state is using its police power and not simply benefitting a special interest. *Id.* at 412. The public purpose does not have to address a temporary or emergency situation. *Id.* One example of a significant and legitimate public purpose that has been upheld is the elimination of unforeseen windfall profits. *Id.* (citing *United States Trust Co. v. New Jersey*, 431 U.S. 1, 31 n. 30 (1976)); *see also Southern Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 895 (9th Cir. 1993) (per curiam) ("if a statute causes unforeseen and unintended consequences such that private parties would obtain windfalls they never expected, later amendment to realign statute with the parties' expected bargain may be reasonable").

If a significant and legitimate public purpose is present, then the court must determine whether the "adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying'" the adjustment. *Energy Reserves Group,* 459 U.S. at 412 (quoting *United States Trust Co. v. New Jersey*, 431 U.S. 1, 22 (1977)). Unless the State is a party to the contract, "'courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.'" *Id.* at 412-13 (quoting *United States Trust Co.*, 431 U.S. at 22-23).

A similar analysis is employed for the Texas Constitution. A statute does not unconstitutionally impair contractual rights if the action is a "valid exercise of the police power

necessary to safeguard the public safety and welfare." *Barshop*, 925 S.W.2d at 635. Laws that are remedial in nature and that do not disturb vested rights are not within the prohibition against the impairment of contracts. *Pratt v. Story*, 530 S.W.2d 325, 328 (Tex. Civ. App.—Tyler 1975, no writ). An example of a remedial law is one that is designed to correct "defects, mistakes, and omissions" in the law. *Rey v. Acosta*, 860 S.W.2d 654, 657 (Tex. App.—El Paso 1993, no writ).

The Liberty companies assert that the 1997 rule that required pass-throughs of the 1991 and 1992 surpluses substantially impairs the policies between the Liberty companies and their policyholders by requiring the Liberty companies to forfeit substantial portions of premiums and by affecting the time period under which the premiums may be retrospectively adjusted. Further, the Liberty companies insist the rule does not serve a substantial and legitimate public purpose; rather, they argue the rule simply favors the pecuniary interests of a narrow group of employers.

As discussed previously, the Liberty companies did not have a vested right to retain the surpluses. Without a vested right, there could be no impermissible impairment of the Liberty companies' contractual rights under the federal or the Texas Constitutions. *See Kestler v. Board of Trustees of N.C. Local Governmental Employees Ret. Sys.*, 48 F.3d 800, 804 (4th Cir. 1995), cert. denied, 516 U.S. 868 (1995); *Pratt*, 530 S.W.2d at 328.[15]

---

[15] The Liberty companies also argue that, even if the 1992 statute authorized the issuance of the 1997 rule, the rule and letter 686-A were issued too late because they had obtained vested rights to the surpluses by that time. They contend the rule was issued beyond the time limitations specified in the fourth amendment and in circular 651. In support of this proposition, they cite to two cases stating parties had a vested right to rely on statutes of limitations as barring claims after the limitations period had passed. *See Mann v. Jack Roach Bissonet, Inc.*, 623 S.W.2d 716, 719 (Tex. Civ. App.—Houston [1st Dist.] 1981, no writ); *Southern Pac. Transp. Co. v. State of Texas*, 380 S.W.2d 123, 127 (Tex. Civ. App.—Houston 1964, writ ref'd). However, as discussed earlier, the Liberty companies did not gain vested rights to the surpluses through the issuance of letter 651

Further, the 1997 rule did not substantially impair the 1991 and 1992 policies. First, the insurance industry is a heavily regulated industry, which weighs against a finding of substantial impairment. *Cf. Energy Reserves Group,* 459 U.S. at 411. Second, the 1997 rule restricted insurers to the profits they reasonably expected: the profits from the sale of workers' compensation insurance to policyholders in the voluntary market. At the time the 1991 amendments and the 1992 statute were enacted, insurers and policyholders understood that the burden of funding the residual market was shifted to policyholders. Neither insurers nor policyholders expected a Facility surplus, and insurers were not expecting to retain an additional profit from a Facility surplus.

In addition, the 1997 rule serves a legitimate public purpose. The workers' compensation insurance industry was in a crisis when the emergency rules were promulgated. In order to prevent insurers from leaving the state and to save the workers' compensation market, the burden of funding the residual market was transferred to and spread among policyholders in the voluntary market. The 1997 rule implements the policy specified in the 1992 statute. The rule is based on reasonable conditions, the unexpected surpluses and the transfer of the obligation of funding the Facility to policyholders, and is of a "character appropriate" to the legitimate purpose of saving the residual market. *Cf. Energy Reserves Group,* 459 U.S. at 412.[16] The 1997 rule also

---

or through the time periods listed in the fourth amendment. Therefore, the length of time between the passage of the 1992 statute and the issuance of the 1997 rule and letter 686-A is not a pivotal factor. *Cf. In re Workers' Compensation Refund*, 46 F.3d at 820 (because claims may be paid long after initial injury, years may pass before determining whether distribution is appropriate).

[16] Because the state is not a party to the insurance policies affected by the 1997 rule, we also defer to the legislative judgment evidenced in the 1992 statute and implemented in the 1997 rule that the 1991 and 1992 Facility surpluses and deficits be passed through to policyholders. *See Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 412 (1983).

prevents insurers from being awarded an unforeseen windfall after being relieved of the burden of funding the Facility.

For all the reasons discussed in the previous paragraphs, the 1997 rule does not violate the prohibition against the impairment of contracts found in the Texas Constitution either. As discussed in the previous section, the rule is a valid exercise of the police power necessary to safeguard the public welfare. Further, the law is remedial in nature; it corrects omissions in the 1991 amendments that only specifically mentioned the pass-through of deficits without addressing the unexpected possibility of Facility surpluses.

We hold that the 1997 rule and the factors specified in letter 686-A do not unconstitutionally impair the Liberty companies' contractual rights. Accordingly, we overrule the Liberty companies' first issue on appeal.[17]

---

[17] In support of their contention that the 1997 rule impairs their contractual rights, the Liberty companies cite to *In re Workers' Compensation Refund*, 46 F.3d 813 (8th Cir. 1995). In that case, the court concluded that a statute that retroactively distributed excess premiums unconstitutionally impaired insurers' contract rights with the Workers' Compensation Reinsurance Association (the "Association,") which reinsured all insurers providing workers' compensation insurance in Minnesota. All insurers were required to be members of the Association and to pay premiums to the Association. Under the terms of the documents constituting the contractual relationship between the insurers and the Association, the Association was required to "collect or distribute to the insurance companies extra or excess premiums in the event of shortages or unneeded accumulations." *Id.* at 816. The Association experienced a surplus, distributed $100 million to insurers, and planned to distribute an additional $302 million to insurers. *Id.* However, before the second surplus was distributed, the Minnesota legislature enacted a statute that required the insurers to refund the first surplus to policyholders and directed the Association to pay the second surplus to policyholders directly.

The court concluded the statute impermissibly impaired the insurers contractual rights because the contract specified that insurers would receive the surpluses and, therefore, gave insurers a reasonable expectation to the surpluses. *Id.* at 817-18. The court also reasoned that benefitting the few policyholders who purchased policies in a particular year was not a significant or legitimate

29

**Deprived of property without due process of law**

In their second issue on appeal, the Liberty companies contend that the 1997 rule and letter 686-A, which require pass-throughs of Facility surpluses for 1991 and 1992, deprive the Liberty companies of their constitutionally protected property rights without due process of law and without advancing any legitimate state interest. The Liberty companies insist that the 1991 emergency rules, the 1992 rule, and circular letter 651 give the Liberty companies a legitimate claim to the surpluses in question under state law. *See Roth*, 408 U.S. at 577 (state-granted benefits that private party has "a legitimate claim of entitlement" under state law are afforded constitutional protection).

We disagree. A law that does not affect a fundamental right does not violate substantive due process as long as it has a rational relationship to a legitimate state interest. *See Texas Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 545 (Tex. 1994). For the reasons discussed earlier, we find the 1997 rule rationally furthers legitimate state purposes.

In addition, in order to bring a substantive due process claim, an individual must show they have a protected interest. *Neuwirth v. Louisiana State Bd. of Dentistry*, 845 F.2d 553, 558 (5th Cir. 1988); *Woody v. Dallas*, 809 F. Supp. 466, 473 (N.D. Tex. 1992). To have a protected interest,

public purpose and amounted to an unexpected windfall for the policyholders. *Id.* at 821.

This case is distinguishable. The Facility surpluses were experienced after, not before, the burden of funding the residual market had been shifted to policyholders at the request of insurers. As discussed previously, policyholders, not insurers, had a reasonable expectation to the surpluses because they were the obligated parties. The amendments and the 1992 statute served a legitimate public purpose. The 1997 rule implements the directive specified in the 1992 statute and prevents insurers from being awarded a windfall profit.

30

the individual must have a legitimate claim of entitlement, which is more than a unilateral expectation. *Roth*, 408 U.S. at 577. Further, property interests are created and defined by existing rules or from independent sources like state law. *Id.* As we discussed previously, the Liberty companies did not have a vested right to retain the surplus from the 1991 and 1992 calendar years, either by law or rule.

We hold that the 1997 rule and the factors specified in letter 686-A do not deprive the Liberty companies of their property without due process of law. Accordingly, we overrule the Liberty companies' third issue on appeal.

## CONCLUSION

Because we have overruled all of the Liberty companies' issues on appeal, we affirm the judgment of the district court.

_____

David Puryear, Justice

Before Justices Kidd, Patterson and Puryear;
    Justice Kidd Not Participating

Affirmed

Filed: March 3, 2006